# NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., Plaintiff,

v.

# Thomas S. KLEPPE et al., Defendants,

and

# National Wildlife Federation and Defenders of Wildlife, Intervening Defendants.

## Civ. A. No. 76–1845.

United States District Court, District of Columbia.

Dec. 17, 1976.

Fred F. Fielding, Denis V. Brenan, Thomas C. Watson, Washington, D. C., for plaintiff.

Earl J. Silbert, U. S. Atty., Washington, D. C., Robert N. Ford, Lawrence T. Bennett, Asst. U. S. Attys., Washington, D. C., Geoffrey A. Mueller, Atty., Land & Natural Resources Div., Dept. of Justice, Washington, D. C., for defendants.

Oliver A. Houck, Washington, D. C., for National Wildlife Federation.

Bruce J. Terris, Edward Comer, Washington, D. C., for Defenders of Wildlife.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND JUDGMENT

WADDY, District Judge.

This action for declaratory and injunctive relief arises under the Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*, the National Environmental Policy Act of 1969 (NEPA) 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*

Plaintiff is the National Rifle Association of America, Inc. (NRA), an independent not-for-profit membership organization whose stated purposes include, *inter alia*, promoting good sportsmanship and fostering the conservation and wise use of renewable wildlife resources. Complaint ¶ 5. A substantial portion of NRA's membership of over one million men and women engage in hunting, many of them hunting ducks, geese, swans and coots throughout the United States, including the Atlantic Flyway, using shotguns with twelve gauge bores or larger. Complaint ¶ 6.

Defendants are Thomas S. Kleppe, Secretary of the Interior, who is responsible for approving regulations promulgated under the Migratory Bird Treaty Act, and Lynn A. Greenwalt, Director of the U.S. Fish & Wildlife Service (the Service), who is responsible for promulgating regulations under that Act.

Intervening as defendants pursuant to Rule 24(b)(2), permissive intervention, Fed. R.Civ.P., are: (1) the National Wildlife Federation (NWF), a national conservation and sportsman's organization with over two million members, which has been involved in study, research and recommendations regarding the controversy in this case since 1970; and (2) Defenders of Wildlife (Defenders), a non-profit nationwide organization of approximately 35,000 members, many of whom are ornithologists, birdwatchers and hunters, which seeks to preserve and protect all species of wildlife.

Plaintiff seeks a declaration that the adoption of regulations promulgated pursuant to authority under the Migratory Bird Treaty Act, 16 U.S.C. § 704,[1] which require the use of steel shot in 12 gauge or larger shotguns in the hunting of ducks, geese, swans (Anatidae) and coots (Fulica americana) in certain designated locations beginning with problem areas in the Atlantic Flyway,[2] violates NEPA and is arbitrary, capricious, an abuse of discretion and otherwise unlawful under Section 706 of the APA. Plaintiff further seeks an injunction proscribing defendant from enforcing the steel shot regulations.

The stated purpose of the steel shot regulations is

"to limit further deposition of lead pellets in areas used by aquatic birds. . . . [which cause] lead intoxication and death to a portion of their populations each year. . . . the net environmental

---

1. The regulations are embodied in amendments to 50 C.F.R. § 20 as adopted on August 27, 1976 (41 F.R. 31386–89 (July 28, 1976)) and September 13, 1976 (41 F.R. 38772–74 (September 13, 1976)).

2. Flyways are regional units of the United States roughly corresponding to North-South waterfowl migration routes, and around which waterfowl hunting regulations are designed. Flyway councils are organizations of fish and game directors of all states in the named waterfowl flyways—Atlantic, Mississippi, Central and Pacific. Environmental Impact Statement (EIS) at 11–12, 68.

result will be the elimination of lead poisoning from ingested lead shotgun pellets as a significant mortality factor among these birds." Environmental Impact Statement (EIS) at 1.

Plaintiff broadly contends that the Environmental Impact Statement (EIS) prepared by the Service fails to answer adequately basic questions about the comparisons of lead to steel shot. It is alleged that defendants have violated NEPA because the regulations do not assure a safe, healthful and productive environment for all Americans, but instead create a risk to human health and safety. Plaintiff further contends the requirements of NEPA have been violated because the Service failed to adequately consider the environmental impact of the proposed action and any irreversible and irretrievable commitments of resources, and by failing to adequately study, develop and describe alternatives.

Defendants and intervenor-defendants maintain that the EIS is adequate in all respects; that existing evidence shows steel shot to be a safe and effective substitute for lead shot, and that the promulgation of the regulations had a rational basis and was not arbitrary, capricious, an abuse of discretion or contrary to law.

Plaintiff filed this suit and motions for a temporary restraining order and preliminary injunction on October 4, 1976. On that same day, the Court denied plaintiff's motion for a temporary restraining order. The case was expedited by agreement of the parties. The motion for preliminary injunction and trial on the merits were consolidated pursuant to Rule 65(a)(2), Fed.R. Civ.P., and heard by the Court without a jury beginning October 20, 1976.

Upon consideration of the pleadings, the testimony of the witnesses, the exhibits, depositions, and documents, including the EIS and the Administrative Record, which were admitted into evidence, and the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

---

**3.** Bellrose, *Lead Poisoning as a Mortality Factor in WaterFowl Populations*, 27 Ill. Natural

## FINDINGS OF FACT

### I. Background Statement

1. The problem of lead poisoning in waterfowl due to ingestion of lead shot was documented as early as 1894. Lead poisoning occurs in migratory waterfowl when spent lead pellets are ingested by ducks, geese, swans and other birds while feeding. The ingested pellets are retained in the gizzard and are both dissolved and worn away by the action of the gizzard. This results in soluable lead passing into the body system, causing sublethal effects and death. EIS at 21–23.

2. A large die-off of waterfowl in Illinois in 1948 led to an extensive study by the Illinois Natural History Survey, in cooperation with Western Cartridge Company (now part of Olin Corporation), the results of which were published in 1959 by Frank C. Bellrose.[3] The study contained an extensive review of the lead poisoning problem and reported on experimental studies of lead poisoning, the physiological effects of ingested lead and ingested steel shot pellets, field experiments, surveys to determine the extent of lead shot ingestion, and tests to determine the extent of mortality.

3. Since the 1959 Bellrose study, the following events have occurred:

a. during the period 1962–65, the Mississippi Flyway Council, in cooperation with Winchester Arms Company, tested experimental steel shot loads at Nilo Farms, Alton, Illinois, and published a review of lead shot poisoning, calling for action to eliminate the problem [Record Item I–21];

b. in 1966, the Sporting Arms and Ammunition Manufacturer's Institute (SAAMI) formed a committee and provided $100,000 to study and develop alternatives to lead shot, in cooperation with the Service. After studies were conducted from 1966 through 1968, steel shot was found by the committee to be the best available alternative [Record Item V–16];

---

History Survey Bulletin, 235 (1959); Administrative Record Item III–I.

c. in 1968, at Patuxent Wildlife Research Center, Laurel, Maryland, the Service, in cooperation with SAAMI, tested steel shot loads on live ducks under controlled conditions. It was demonstrated at that time that steel shot performed effectively [Record Item IV–5];

d. in 1970, the International Association of Game, Fish and Conservation Commissioners [4] passed a resolution calling upon the Service to begin a transition from toxic to nontoxic shot for waterfowl hunting [Record Item I–29];

e. during the period 1970–71, there was further development of steel shot ammunition with extensive testing by Remington Arms Company [Record Item IV–8]; and

f. in 1972, the National Wildlife Federation filed a detailed petition with the Secretary of the Interior requesting the issuance of regulations prohibiting the use of lead shot in hunting migratory waterfowl [Record Items I–1–2].

4. In order to obtain more refined information on the degree of waterfowl exposure to lead, to detect regional differences in exposure and to compare the information to that collected by Bellrose, the Service, in 1972, initiated a study to determine the concentration of lead in wingbones of waterfowl. The Service determined there was a statistically significant and positive relationship between the incidence of lead pellets in mallard gizzards reported by Bellrose and the lead levels in the wings of immature mallards analyzed in the Service study. EIS at 33–38.

5. Among ducks, the annual mortality rate is estimated to be at least 45 percent of the fall flight. Approximately one half of these deaths are attributed to hunting. Deaths caused by lead poisoning are estimated by indirect methods to be from two to three percent of the fall flight not killed by hunters, or approximately 1.6 to 2.4 million birds.[5] EIS at 6–7, 38–41.

6. The highest average lead levels were found in wings from the Atlantic Flyway.[6] They were more than twice the levels found on other flyways. Despite several tests, the Service was unable to discover any sources of lead other than from spent lead pellets which would explain the high Atlantic Flyway levels. EIS at 33–38.

7. In 1972, the Secretary called a meeting of arms and ammunition manufacturers, Flyway Councils and conservation organizations to develop a strategy for solving the lead shot poisoning problem. Advisory steel shot policy and technical coordinating committees were appointed by the Secretary, with representatives from the affected industries, state fish and game agencies and public interests groups. EIS at 62.

8. From 1972 through 1975, in consultation with the coordinating committees, the Service surveyed the literature and among other things:

a. revaluated the nature and extent of the lead shot poisoning problem in the United States, with particular reference to data and studies produced since 1959 [EIS at 21–32];

b. examined alternative sources of lead as a waterfowl mortality factor [Tr. 372; EIS at 20–21, 35–38; Ds. Ex. 2 at 44–45];

c. surveyed reports of actual die-offs [EIS at 38–41];

d. compared the toxicity of alternative shot types [EIS at 254–261]; and

e. analyzed the toxic and (in consultation with EPA) the environmental effects of steel shot [EIS at 42–44; Tr. 335].

---

**4.** The International Association of Game, Fish and Conservation Commissioners is, as its name implies, an organization of the fish and game departments from every State.

**5.** These estimates are based on a representative fall flight of 100 million ducks.

**6.** The Atlantic Flyway was not included in the correlation with the Bellrose findings because mallard gizzards from that region were not an important part of the Bellrose gizzard collection. EIS at 34.

9. On July 12, 1974, the Service published a draft environmental impact statement (Record Item II–2); on July 23, 1974, it published proposed nontoxic shot regulations for public review and comment. 39 F.R. 36745–47; Record Item II–5. The proposed regulations were extensively publicized, public hearings were held, and public comment, running heavily in favor of the proposal, was received. Record Item II–6.

10. During 1975, the draft environmental impact statement and the proposed regulations were revised in light of comments received in correspondence and at public hearings. EIS at 62, 67, 73–74. Notice of availability of the final EIS was published on January 13, 1976. 41 F.R. 1934.

11. Following a 60-day review of the final EIS and evaluation of comments and proposed modifications, the Secretary of the Interior, on March 20, 1976, made his decision to implement the use of steel shot in designated problem areas by gradual and orderly transition beginning in the Atlantic Flyway in the 1976 hunting season, the Mississippi Flyway in 1977, and the Central and Pacific Flyways in 1978. Tr. 343; Ds. Ex. 2 at 66.

12. The Service then began consultation with the Atlantic Flyway Council, Atlantic Flyway State directors and the various States to define and precisely describe the boundaries of recommended areas of implementation or alternative areas proposed by the States. Record Item II–1.

13. On July 28, 1976, the Service published its final regulation on use of steel shot ammunition. 41 F.R. 31386–89. Also on July 28, the Service published a proposed rulemaking delineating specific areas which steel shot would be required in the Atlantic Flyway in 1976. 41 F.R. 31395–96; Record Item II–5.

14. On September 13, 1976, the Service published an amendment to its final rulemaking of July 28 on use of steel shot ammunition for hunting waterfowl. Record Item II–5. The amendment permits the use of lead shot ammunition in guns smaller than 12 gauge for only one year. 41 F.R. 38772. In addition, on September

13, the Service published a final rulemaking defining the specific areas for use of steel shot in the Atlantic Flyway during the 1976 hunting season. 41 F.R. 38772–74.

## II. Risks to Human Health and Safety

15. Plaintiff argues that the regulation requiring the use of steel shot creates a risk to human health and safety. They point to possible injuries resulting from damages to and bursting of gun barrels, from ricochet and from reloading. The EIS and the administrative record show extensive attention to the possibility of safety and property risks.

### A. Barrel Damage and Bursts

16. The Service analyzed its own tests, and those which had been conducted over several years by ammunition manufacturers, to determine whether greater shotgun barrel wear, choke deformation (expansion), and split or burst barrels could be anticipated with steel shot loads over that known to occur with lead shot loads in guns commonly used in waterfowl hunting. EIS at 246–253; Record Items IV–13 to 17. The Service also raised the issue with the Secretary's advisory committees and by direct correspondence with manufacturers and with the plaintiff. Tr. 341–342; Record Items VI–1 to 7.

17. On the basis of all test data and responses received, the Service concluded:

a. The problem of choke expansion varies with different makes and types of shotguns. It also occurs with the use of lead shot as well, although usually to a lesser degree. Tests show that although lightweight doublebarrel guns with thin barrels (not often used in waterfowl hunting) may be more susceptible to these changes, with modern American-made single barrel shotguns of good quality choke expansion either has not occurred or has been sufficiently slight as to have no measurable effect on gun performance or shot pattern. EIS at 50–51.

b. The introduction and widespread use throughout the industry of a protective liner to enclose the shot charge within the shot shells appears to have eliminated the barrel wear problem that was of concern in earlier years. EIS at 50.

c. Split or burst barrels can result from the discharge of any shot into an obstructed barrel (mud, snow, shotgun shell wadding) or from a defective shell. This is known to occur with lead shot. Although there may be a hypothetical possibility of a greater frequency of bursts of obstructed, or marginally obstructed, barrels with steel, this possibility has not been substantiated by the numerous field and laboratory tests to date. EIS at 51–52. Even assuming a higher rate of obstructed barrel bursts with steel shot, the problem could be alleviated by the use of suitable guns and proper safety precautions. EIS at 52.

d. Present information is not sufficient to compare the rate of barrel bursts which might be derived from field experience with steel shot vs. lead shot because of the fact that: (i) the number of annual barrel bursts which are attributable to heavier lead loads (comparable to steel loads used in waterfowl hunting) is unknown; (ii) there may be possible differences in barrel damage reporting rates between users of the two shot types; (iii) the barrel bursts which were reported in 1972–1975 Service field tests of steel shots were, to the extent the cause of rupture is known, not uniquely attributable to steel shot. EIS at 51–52; See also Tr. 204–206.

18. Testimony by defendants' witnesses from the Remington Arms and Federal Cartridge Companies with respect to tests they had summarized in correspondence to the Secretary, and which are a part of the record, generally supports the findings made in paragraph No. 16, *supra.*

19. While lead shot rarely causes ring bulges, steel shot produces ring bulges at the choke forcing cones of many shotguns, indicating that the shot has stressed the barrel beyond its elastic limit and thereby weakened it. Tr. 129–30, 137, 141, 154, 177–78; Pl. Ex. 4 A–C. However, after hundreds of thousands of steel shot firings in numerous types of gun barrels, while choke expansion of the magnitude stated in the EIS was found, not a single burst occurred. Tr. 236, *et seq.* Plaintiff's witness from the Browning Company also confirmed these results with tests performed using Browning shotguns. Tr. 138, 152.

20. Of approximately 1.5 million rounds of steel shot fired in Service field tests from 1973–1975, four barrel bursts occurred. No information was received from shotgun manufacturers to indicate that the cause of these bursts was uniquely the result of steel shot. EIS at 51.

### B. Ricochet

21. The Service considered whether there was increased safety hazard due to ricochet. Steel shotshell boxes of the three major ammunition manufacturers do contain ricochet warnings with respect to flat surfaces or water. Pl.Ex. 4 A–C. The Service concluded that the hazard due to ricochet from steel differs from that of lead shot and that it was unclear whether the hazard was any greater with steel shot. EIS at 52, 57.

### C. Reloading Dangers

22. The EIS identified the effects on conversion to steel on reloaders as the possibility of increased costs due to new powders, primers and other components which were not available when the EIS was published; and, the possibility that a reloader may be less able to safely vary the charge and loads. EIS at 53–54. Shell shot containers caution users not to remove the steel shot for use in reloads. Pl. Ex. 4 A–C.

23. Having identified and discussed these, and other problems, the EIS states that information on the suitability of using steel shot is not currently available for all shotgun makes, models and years of manufacture. EIS at 53. The government be-

lieves that the responsibility for providing complete information rests with the arms industry, as the manufacturers and marketers of the products. Pl. Ex. 2 at 54, 56–57. Such information is now being provided by some manufacturers in consumer information pamphlets or by disclaimers of liability in shotgun warranties. Pl. Ex. 5, 6. Additionally, ammunition boxes of three major manufacturers carry precautionary statements, and in the case of one manufacturer have carried them since the first experimental load of steel shot was produced. Tr. 276–78; Pl. Ex. 4 A–C.

### III. Adequacy of the EIS

#### A. Adverse Effects of Steel Shot on Waterfowl and the Environment

24. In determining whether steel shot is as effective as lead shot, the EIS references, summarizes and discusses the results of over 30 years of research on the subject. The Service did not request any agency of the Government with expertise in ballistics and firearms to conduct any tests or provide any additional information. Pl.Ex. 2 at 52–53.

25. The EIS indicates steel shot might not be as effecting in downing waterfowl as lead shot. EIS at 47, 225–245, 266–267. The Service estimated that if all waterfowl hunting with lead shot were banned nationwide, and steel shot required, the number of ducks downed, but not retrieved, would be approximately 377,000 ducks. EIS at 266–267. This is a "worst case" estimate. The lead shot ban is not effective nationwide, and when applied in other flyways, will apply only in certain areas where hunting is concentrated so the implementation loss estimate will be lower. EIS at 267. The Service concluded that such losses would be more than offset by the gains anticipated from selective conversion to steel shot. EIS at 48.

26. The EIS contains results of tests conducted in 1972–73 at Nilo Farms, Alton, Illinois, which indicated crippling loss would increase dramatically. The Service, however, ultimately concluded that steel shot loads could be expected to perform quite similarly to lead shot loads commonly used by waterfowl hunters. In reaching that conclusion, the Service considered: (1) the results of its own tests similar to those performed at Nilo, at Patuxent, Maryland, in 1968; (2) the results of its annual field test from 1972–1975; (3) the fact that the Nilo test compared only exceptionally powerful lead loads not commonly used by waterfowl hunters to standard steel shot loads; (4) the pattern superiority of steel shot due to its better "form factor"; and (5) the hunter aim-error factor perfected by E. D. Lowry who was also a participant at Nilo. EIS at 44–48, 157, 208–211, 228–233; Record Items IV–1 to 3, 10; Tr. 303, 315.

27. Robert Bister, Shooting Editor of Field and Stream Magazine, and a qualified expert in proven ballistics, testified that he had performed an additional test, beginning in January 1976, which indicates steel shot is slightly more effective than lead shot. His test was not identified in the EIS. Tr. 314, 315.

28. After reviewing available test results, the Service concluded there was no evidence that ingested steel shot is toxic to waterfowl. EIS at 44. No tests were available, and none were conducted, to determine if steel shot increases disease susceptibility.

29. Using presently available scientific knowledge, the Service concluded that it was improbable that the amount of iron that would be introduced into the aquatic environment as steel shot would have an adverse effect on aquatic organisms and plants.[7] EIS at 42–43.

---

7. James C. Irwin, an expert in Wildlife Disease Ecology, testified that there does exist a Service study relating to this problem which is not discussed by the EIS, and which indicates that iron (steel) shot may be toxic to quiet plants, and in certain situations, to certain types of marshes. Tr. 82–84, 102–107. Mr. Irwin has not conducted tests in this area, and did not, either in written comment or at hearings on the draft impact statement, identify this particular problem. Tr. 112–114.

## B.  Alternatives

### Lead-Iron Shot

30.  Nontoxic types of shot, including, among others, various alloys of lead, lead-iron combinations and other metals, were considered and discussed at length in Appendix III to the EIS.  The Service conducted, surveyed and analyzed studies and tests of alternative shot types to determine whether another nontoxic, ballistically adequate, reasonably priced, relatively inert, safe shot was available and should be prescribed by regulation.  EIS at 254–263; Record Items VI–8, 9;  V–16 to 19;  IV–1, 4, 5, 11, 12;  III–5;  I–5, 14.

31.  Some limited studies of lead-iron shot indicate that ingestion of lead-iron shot causes considerably less toxicity among waterfowl than ingestion of lead shot and that lead-iron shot would not damage shotguns.  Tr. 60–61; EIS at 261.  The Service concluded, however, that no field testing of the effectiveness of lead-steel shot had been conducted to assess crippling loss, that more study was necessary on its toxic effects, and that this type of shot was not then, and is not now, available in sufficient quantities for adequate testing.  These conclusions were supported by the testimony of plaintiff's witness Mr. James C. Irwin.  EIS at 61, 80;  Tr. 100–101, 108–109, 114–118, 351–352, 360.  The Service has undertaken studies on this shot as it has been made available, and these studies are still underway.  Tr. 362–363.

### Wetlands Management

32.  With respect to wetlands management, the Service considered such possibilities as tilling of marsh bottoms, control of water levels, and draining of marsh bottoms.  It was concluded that this alternative was unacceptable because the techniques cannot be utilized in many wetland areas,[8] particularly in tidal lands with sandy bottoms, and also because it poses a risk of destroying the habitat.  EIS at 264–265; Tr. 226–227, 231–232, 349–350.

33.  The implementation plan adopted by the Secretary is flexible enough to permit State and local authorities to attempt wetlands management techniques where feasible.  EIS at 60, 265.

### State Regulation

34.  Generally, the States, with the possible exception of Maine and California, cooperated with the Federal government on the lead poisoning problem.  Pl. Ex. 2 at 41–43. In addition, the State Fish and Game Commissions documented their willingness to cooperate in a resolution of the International Association of Game, Fish and Conservation Commission.  Record Item I–29.

35.  The EIS discussed leaving the problem to State and local regulation and management under the topic "No Action".  The Service concluded that while the States have the authority to exercise management and regulatory options, only a few States have taken positive steps in specific locations, and that lead poisoning continues to be a problem, some of the reasons for which are beyond the control of the States.  The regulations promulgated do not preclude the States from taking additional action. EIS at 58.

36.  The EIS and the administrative record show extensive consideration of reasonable and viable alternatives, including nontoxic shot types, wetlands management, taking no Federal action (thus leaving the problem to the States), no hunting of waterfowl, flyway-wide implementation of the regulations, simultaneous implementation of the regulations in all four flyways, and delaying the start of implementation.

### C.  Irreversible and Irretrievable Commitment of Resources

37.  The irreversible and irretrievable commitment of resources relating to the crippling of waterfowl and risks to health and safety, are included in the Findings of Fact which pertain to those topics, *supra.*

38.  The arms manufacturers have incurred costs in testing, and changes in bar-

---

**8.**  There was a considerable difference in the testimony of witnesses as to what percentage

of wetlands could be effectively managed.  *See,* Tr. 221, 350.

rels and production as a result of the introduction of steel shot for use in shotguns. Tr. 128–129, 133–134, 254–256. The Service recognized that manufacturers would be faced with such problems in producing and distributing steel shot loads suitable for hunting, but determined the extended development period would reduce associated impacts. It recognized production and development costs would be passed on to the consumer, and that there might well be a brief increase in shotgun sales. EIS at 55, 58.

39. The arms and ammunition industry provided no comments on any perceived impacts as to irreversible and irretrievable commitments of resources, either in response to requests for comment in the draft EIS, in the Secretary's advisory committee meetings, or elsewhere. Ds. Ex. 2 at 47–54; Tr. 356–357.

40. The Service did not request any Federal Government agency to examine the impact of regulations enforcement. The EIS noted that there is usually a small percentage of the hunting public that wilfully violates State and Federal hunting regulations, and that, generally, compliance is directly related to hunter acceptance and understanding of the need for regulations. It is anticipated that this will also apply to the use of steel shot. EIS at 3, 54.

## CONCLUSIONS OF LAW

1. The Secretary's authority to issue regulations prescribing the means by which migratory waterfowl are to be hunted (in this case with steel shot) is grounded on the Migratory Bird Treaty Act, 16 U.S.C. 704 (1970), and is not contested herein. Further, plaintiff does not contend that the procedures followed in issuing the regulations were improper.

2. Prior to the issuance of any regulation relating to a major Federal action which may significantly affect the quality of the human environment, and as part of the decision-making process, the Secretary has the responsibility under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, to consider and balance environmental factors, along with the considerations mandated by the Migratory Bird Treaty Act. *Calvert Cliffs' Coordinating Committee v. A. E. C.,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). NEPA's "requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts." *Id.* at 1114.

3. The EIS discussion of the socio-economic impacts of steel shot use, particularly with respect to the risks to health and safety, adequately analyzes the potential effects of steel shot on gun barrels, hunters, including those who load their own shells, and the sporting arms and ammunition industry. The regulations do not violate the substantive requirements of NEPA by failing to assure a safe, healthful and productive environment for all Americans.

4. The EIS references, summarizes and discusses the results of over thirty years of research on lead and steel shot in an objective fashion, and describes adequately and at length the environmental impacts of lead shot and steel shot on waterfowl, aquatic organisms, flora, and humans.

5. All reasonable, viable and meaningful alternatives are adequately considered in the EIS. The alternative section contains information regarding alternatives to the implementation of the proposed regulation. Appendix III adequately discusses shot types other than steel or lead to the extent of the current state of knowledge concerning their availability, relative toxicity and effectiveness, and Appendix IV adequately presents habitat management techniques and explains their limitations. Similarly, the EIS gave adequate consideration to the alternative of State regulation.

6. The adoption of the regulation does not foreclose substitute shot types, State regulation or habitat manipulation. The regulation includes provisions for approval of other shot types when their effects are sufficiently known and also allows for wetlands management techniques in areas of the country in which they are feasible.

7. The Service's discussion of irreversible and irretrievable commitments of resources involved in the proposed regulation is adequate.

■ 8. The EIS is an objective, good-faith document disclosing the known and unknown environmental impacts of the regulation and all reasonable and viable alternatives thereto, and represents the "hard-look" by the agency required by NEPA. *Natural Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (1972).

■ 9. The information and studies which were available to the Secretary were sufficient to permit the preparation of an EIS which meets the requirements of NEPA, and accordingly there is no warrant for invalidating the Secretary's decision on the grounds that additional studies are required. *State of Alaska v. Kleppe,* Civil Action No. 76–0368 (D.D.C., August 13, 1976), appeal pending.

■ 10. The existence of a disagreement among experts is not enough to invalidate an EIS. *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir. 1973).

■ 11. The Secretary's discretion under the APA is exceedingly broad. In ruling upon plaintiff's allegation that the Secretary's action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," within the meaning of 5 U.S.C. § 706(2)(A), the Secretary's decision is entitled to a presumption of regularity, and "the court must consider whether the decision was based on a consideration of the relevant factors, and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). The court's review is not *de novo* but rather is confined to the administrative record which was before the Secretary at the time he made his decision, together with such affidavits or testimony as the court may deem necessary to explain the reasons for the Secretary's decision. *Id.* at 419–420, 91 S.Ct. 814; *Camp v. Pitts,* 411 U.S. 138,

142–143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

■ 12. The Secretary's conclusions and decision to issue the steel shot regulations challenged herein had a rational basis in fact, and were not arbitrary, capricious, an abuse of discretion or contrary to law.

■ 13. It is for the Secretary, and not the Court, to balance the various competing interests. Indeed, it is not appropriate for a court to substitute its judgment for that of the administrator. *Camp v. Pitts, supra; Citizens to Preserve Overton Park v. Volpe, supra; Calvert Cliffs' Coordinating Committee v. A. E. C., supra.*

14. The Court has considered all other issues and arguments raised by plaintiff and finds them to be without merit.

Upon consideration of all of the foregoing, the Court enters the following:

### JUDGMENT

The issues in the above-captioned action having been duly tried and the Court having entered herein its Findings of Fact and Conclusions of Law, it is by the Court,

ORDERED and ADJUDGED that the plaintiff take nothing, and that this action be, and the same hereby is, dismissed on the merits.