# WEINBERGER, SECRETARY OF DEFENSE, ET AL. *v.* ROMERO-BARCELO ET AL.

No. 80–1990.   Argued February 23, 1982—Decided April 27, 1982

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 321. STEVENS, J., filed a dissenting opinion, *post*, p. 322.

*Elinor H. Stillman* argued the cause for petitioners. On the briefs were *Solicitor General Lee, Acting Assistant Attorney General Liotta, Edward J. Shawaker, Anne S. Almy, Thomas E. Flynn,* and *Richard M. Cornelius.*

*John A. Hodges* argued the cause for respondents. With him on the brief were *Hector Reichard de Cardona,* Secretary of Justice of Puerto Rico, *Gerardo A. Carlo, Timothy L. Harker,* and *Lawrence White.*

JUSTICE WHITE delivered the opinion of the Court.

The issue in this case is whether the Federal Water Pollution Control Act (FWPCA or Act), 86 Stat. 816, as amended, 33 U. S. C. § 1251 *et seq.* (1976 ed. and Supp. IV), requires a district court to enjoin immediately all discharges of pollut-

ants that do not comply with the Act's permit requirements or whether the district court retains discretion to order other relief to achieve compliance. The Court of Appeals for the First Circuit held that the Act withdrew the courts' equitable discretion. *Romero-Barcelo* v. *Brown*, 643 F. 2d 835 (1981). We reverse.

I

For many years, the Navy has used Vieques Island, a small island off the Puerto Rico coast, for weapons training. Currently all Atlantic Fleet vessels assigned to the Mediterranean Sea and the Indian Ocean are required to complete their training at Vieques because it permits a full range of exercises under conditions similar to combat. During air-to-ground training, however, pilots sometimes miss land-based targets, and ordnance falls into the sea. That is, accidental bombings of the navigable waters and, occasionally, intentional bombings of water targets occur. The District Court found that these discharges have not harmed the quality of the water.

In 1978, respondents, who include the Governor of Puerto Rico and residents of the island, sued to enjoin the Navy's operations on the island. Their complaint alleged violations of numerous federal environmental statutes and various other Acts.[1] After an extensive hearing, the District Court found

---

[1] The complaint charged the Navy with violations of the National Environmental Policy Act of 1969, 42 U. S. C. § 4321 *et seq.* (1976 ed. and Supp. IV); the Federal Water Pollution Control Act, 33 U. S. C. § 1251 *et seq.* (1976 ed. and Supp. IV); the Clean Air Act Amendments of 1977, 42 U. S. C. § 7401 *et seq.* (1976 ed., Supp. IV); the Noise Control Act of 1972, 42 U. S. C. § 4901 *et seq.;* the Resource Conservation and Recovery Act of 1976, 42 U. S. C. § 6901 *et seq.;* the Endangered Species Act of 1973, 16 U. S. C. § 1531 *et seq.;* the National Historic Preservation Act of 1966, 16 U. S. C. § 470 *et seq.;* the Coastal Zone Management Act of 1972, 16 U. S. C. § 1451 *et seq.;* the Marine Mammal Protection Act of 1972, 16 U. S. C. § 1361 *et seq.* (1976 ed. and Supp. IV); the Rivers and Harbors Appropriation Act of 1899, 33 U. S. C. § 401 *et seq.;* various Amendments

that under the explicit terms of the Act, the Navy had vio-
lated the Act by discharging ordnance into the waters sur-
rounding the island without first obtaining a permit from the
Environmental Protection Agency (EPA).[2]  *Romero-Barcelo*
v. *Brown*, 478 F. Supp. 646 (PR 1979).

Under the FWPCA, the "discharge of any pollutant" re-
quires a National Pollutant Discharge Elimination System
(NPDES) permit.   33 U. S. C. §§ 1311(a), 1323(a) (1976 ed.
and Supp. IV).   The term "discharge of any pollutant" is
defined as

> "any addition of any *pollutant* to the waters of the
> contiguous zone or the ocean from any *point source* other
> than a vessel or other floating craft."   33 U. S. C.
> § 1362(12) (emphasis added).

Pollutant, in turn, means

> "dredged spoil, solid waste, incinerator residue, sewage,
> garbage, sewage sludge, *munitions*, chemical wastes,
> biological materials, radioactive materials, heat, wrecked

to the United States Constitution, congressional and Presidential direc-
tives concerning cessation of Navy operations on the neighboring island of
Culebra, and Puerto Rico law.

[2] The District Court also found that the Navy had violated the National
Environmental Policy Act (NEPA) by failing to file an Environmental Im-
pact Statement (EIS) or a reviewable environmental record to support a
decision not to file such a statement, *Romero-Barcelo* v. *Brown*, 478 F.
Supp. 646, 705 (PR 1979), and had failed to nominate historic sites to the
National Register as required under the National Historic Preservation
Act.   *Ibid.*   It ordered the Navy to nominate such sites and to file an EIS.
*Id.*, at 708.   The Court of Appeals remanded issues under the Endangered
Species Act and the National Historic Preservation Act to the District
Court for further consideration.   *Romero-Barcelo* v. *Brown*, 643 F. 2d
835, 858, 860, 862 (1981).   It vacated the order involving NEPA and re-
manded with orders to dismiss because the Navy had filed an EIS in the
interim.   *Id.*, at 862.   Only the issue involving the FWPCA is before this
Court.

or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. . . ." 33 U. S. C. § 1362(6) (emphasis added).

And, under the Act, a "point source" is

"any discernible, confined and discrete *conveyance*, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or *vessel or other floating craft from which pollutants are or may be discharged*. . . ." 33 U. S. C. § 1362(14) (1976 ed., Supp. IV) (emphasis added).

Under the FWPCA, the EPA may not issue an NPDES permit without state certification that the permit conforms to state water quality standards. A State has the authority to deny certification of the permit application or attach conditions to the final permit. 33 U. S. C. § 1341.

As the District Court construed the FWPCA, the release of ordnance from aircraft or from ships into navigable waters is a discharge of pollutants, even though the EPA, which administers the Act, had not promulgated any regulations setting effluent levels or providing for the issuance of an NPDES permit for this category of pollutants.[3] Recognizing that violations of the Act "must be cured," 478 F. Supp., at 707, the District Court ordered the Navy to apply for an NPDES permit. It refused, however, to enjoin Navy operations pend-

---

[3] The EPA issues effluent limitations for categories and classes of point sources. See generally *E. I. du Pont de Nemours & Co. v. Train*, 430 U. S. 112 (1977); 40 CFR part 400 *et seq.* (1981). In a situation somewhat similar to that before us, the Secretary of the Interior has, under the Migratory Bird Treaty Act, 16 U. S. C. § 703 *et seq.* (1976 ed. and Supp. IV), regulated deposit of shot into water by duck hunters who miss their targets. *National Rifle Assn. v. Kleppe*, 425 F. Supp. 1101 (DC 1976), affirmance order, 187 U. S. App. D. C. 240, 571 F. 2d 674 (1978).

ing consideration of the permit application. It explained that the Navy's "technical violations" were not causing any "appreciable harm" to the environment.[4] *Id.*, at 706. Moreover, because of the importance of the island as a training center, "the granting of the injunctive relief sought would cause grievous, and perhaps irreparable harm, not only to Defendant Navy, but to the general welfare of this Nation."[5] *Id.*, at 707. The District Court concluded that an injunction was not necessary to ensure suitably prompt compliance by the Navy. To support this conclusion, it emphasized an equity court's traditionally broad discretion in deciding appropriate relief and quoted from the classic description of injunctive relief in *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329–330 (1944): "The historic injunctive process was designed to deter, not to punish."

The Court of Appeals for the First Circuit vacated the District Court's order and remanded with instructions that the court order the Navy to cease the violation until it obtained a permit. 643 F. 2d 835 (1981). Relying on *TVA* v. *Hill*, 437 U. S. 153 (1978), in which this Court held that an imminent violation of the Endangered Species Act required injunctive relief, the Court of Appeals concluded that the District Court

---

[4] The District Court wrote:

"In fact, if anything, these waters are as aesthetically acceptable as any to be found anywhere, and Plaintiff's witnesses unanimously testified as to their being the best fishing grounds in Vieques." 478 F. Supp., at 667. "[I]f the truth be said, the control of large areas of Vieques [by the Navy] probably constitutes a positive factor in its over all ecology. The very fact that there are in the Navy zones modest numbers of various marine species which are practically non-existent in the civilian sector of Vieques or in the main island of Puerto Rico, is an eloquent example of *res ipsa loquitur*." *Id.*, at 682 (footnote omitted).

[5] The District Court also took into consideration the delay by plaintiffs in asserting their claims. It concluded that although laches should not totally bar the claims, it did strongly militate against the granting of injunctive relief. *Id.*, at 707.

erred in undertaking a traditional balancing of the parties' competing interests. "Whether or not the Navy's activities in fact harm the coastal waters, it has an absolute statutory obligation to stop any discharges of pollutants until the permit procedure has been followed and the Administrator of the Environmental Protection Agency, upon review of the evidence, has granted a permit." 643 F. 2d, at 861. The court suggested that if the order would interfere significantly with military preparedness, the Navy should request that the President grant it an exemption from the requirements in the interest of national security."[6]

Because this case posed an important question regarding the power of the federal courts to grant or withhold equitable relief for violations of the FWPCA, we granted certiorari, 454 U. S. 813 (1981). We now reverse.

## II

It goes without saying that an injunction is an equitable remedy. It "is not a remedy which issues as of course," *Harrisonville* v. *W. S. Dickey Clay Mfg. Co.*, 289 U. S. 334, 337–338 (1933), or "to restrain an act the injurious consequences of which are merely trifling." *Consolidated Canal*

---

[6] Title 33 U. S. C. § 1323(a) (1976 ed., Supp. IV) provides, in relevant part:

"The President may exempt any effluent source of any department, agency, or instrumentality in the executive branch from compliance with any such a requirement if he determines it to be in the paramount interest of the United States to do so . . . . No such exemptions shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemption shall be for a period not in excess of one year, but additional exemptions may be granted for periods of not to exceed one year upon the President's making a new determination. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting such exemption."

*Co.* v. *Mesa Canal Co.*, 177 U. S. 296, 302 (1900). An injunction should issue only where the intervention of a court of equity "is essential in order effectually to protect property rights against injuries otherwise irremediable." *Cavanaugh* v. *Looney,* 248 U. S. 453, 456 (1919). The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies. *Rondeau* v. *Mosinee Paper Corp.*, 422 U. S. 49, 61 (1975); *Sampson* v. *Murray,* 415 U. S. 61, 88 (1974); *Beacon Theaters, Inc.* v. *Westover,* 359 U. S. 500, 506–507 (1959); *Hecht Co.* v. *Bowles, supra,* at 329.

Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a "nice adjustment and reconciliation" between the competing claims, *Hecht Co.* v. *Bowles, supra,* at 329. In such cases, the court "balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." *Yakus* v. *United States,* 321 U. S. 414, 440 (1944). "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co.* v. *Bowles, supra,* at 329.

In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496, 500 (1941). Thus, the Court has noted that "[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," and that "where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the

plaintiff." *Yakus* v. *United States, supra,* at 440 (footnote omitted). The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law. *TVA* v. *Hill,* 437 U. S., at 193; *Hecht Co.* v. *Bowles,* 321 U. S., at 329.

These commonplace considerations applicable to cases in which injunctions are sought in the federal courts reflect a "practice with a background of several hundred years of history," *Hecht Co.* v. *Bowles, supra,* at 329, a practice of which Congress is assuredly well aware. Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles. *Hecht Co.* v. *Bowles, supra,* at 329. As the Court said in *Porter* v. *Warner Holding Co.,* 328 U. S. 395, 398 (1946):

> "Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' *Brown* v. *Swann,* 10 Pet. 497, 503 . . . ."

In *TVA* v. *Hill,* we held that Congress had foreclosed the exercise of the usual discretion possessed by a court of equity. There, we thought that "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer" than that before us. 437 U. S., at 173. The statute involved, the Endangered Species Act, 87 Stat. 884, 16 U. S. C. § 1531 *et seq.,* required the District Court to enjoin completion of the Tellico Dam in order to preserve the snail

darter, a species of perch. The purpose and language of the statute under consideration in *Hill,* not the bare fact of a statutory violation, compelled that conclusion. Section 7 of the Act, 16 U. S. C. § 1536, requires federal agencies to "insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of [any] endangered species . . . or result in the destruction or modification of habitat of such species which is determined . . . to be critical." The statute thus contains a flat ban on the destruction of critical habitats.

It was conceded in *Hill* that completion of the dam would eliminate an endangered species by destroying its critical habitat. Refusal to enjoin the action would have ignored the "explicit provisions of the Endangered Species Act." 437 U. S., at 173. Congress, it appeared to us, had chosen the snail darter over the dam. The purpose and language of the statute limited the remedies available to the District Court; only an injunction could vindicate the objectives of the Act.

That is not the case here. An injunction is not the only means of ensuring compliance. The FWPCA itself, for example, provides for fines and criminal penalties. 33 U. S. C. §§ 1319(c) and (d). Respondents suggest that failure to enjoin the Navy will undermine the integrity of the permit process by allowing the statutory violation to continue. The integrity of the Nation's waters, however, not the permit process, is the purpose of the FWPCA.[7] As Congress explained, the objective of the FWPCA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U. S. C. § 1251(a).

---

[7] The objective of this statute is in some respects similar to that sought in nuisance suits, where courts have fully exercised their equitable discretion and ingenuity in ordering remedies. *E. g., Spur Industries, Inc.* v. *Del E. Webb Development Co.,* 108 Ariz. 178, 494 P. 2d 700 (1972); *Boomer* v. *Atlantic Cement Co.,* 26 N. Y. 2d 219, 257 N. E. 2d 870 (1970).

This purpose is to be achieved by compliance with the Act, including compliance with the permit requirements.[8]   Here, however, the discharge of ordnance had not polluted the waters, and, although the District Court declined to enjoin the discharges, it neither ignored the statutory violation nor undercut the purpose and function of the permit system.   The court ordered the Navy to apply for a permit.[9]   It temporarily, not permanently, allowed the Navy to continue its activities without a permit.

In *Hill*, we also noted that none of the limited "hardship exemptions" of the Endangered Species Act would "even remotely apply to the Tellico Project."   437 U. S., at 188. The prohibition of the FWPCA against discharge of pollutants, in contrast, can be overcome by the very permit the Navy was ordered to seek.[10]   The Senate Report to the 1972

[8] Federal agencies must comply with the water pollution abatement requirements "in the same manner, and to the same extent as any nongovernmental entity . . . ."   33 U. S. C. § 1323(a) (1976 ed., Supp. IV). S. Rep. No. 92–414, p. 80 (1971), pointed to "[f]ederal agencies such as the Department of Defense" for failing to abate pollution.

[9] The Navy applied for an NPDES permit in December 1979.   In May 1981, the EPA issued a draft NPDES permit and a notice of intent to issue that permit.   The FWPCA requires a certification of compliance with state water quality standards before the EPA may issue an NPDES permit.   33 U. S. C. § 1341(a).   The Environmental Quality Board of the Commonwealth of Puerto Rico denied the Navy a water quality certificate in connection with this application for an NPDES in June 1981.   In February 1982, the Environmental Quality Board denied the Navy's reconsideration request and announced it was adhering to its original ruling.   In a letter dated April 9, 1982, the Solicitor General informed the Clerk of the Court that the Navy has filed an action challenging the denial of the water quality certificate.   *United States* v. *Commonwealth of Puerto Rico*, Civ. Action No. 82–0726 (Dist. Ct. PR).

[10] As we have explained, the 1972 Amendments to the FWPCA established the NPDES as

"a means of achieving and enforcing the effluent limitations.   Under the NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms.   An NPDES permit serves

Amendments explains that the permit program would be enacted because "the Committee recognizes the impracticality of any effort to halt all pollution immediately." S. Rep. No. 92–414, p. 43 (1971). That the scheme as a whole contemplates the exercise of discretion and balancing of equities militates against the conclusion that Congress intended to deny courts their traditional equitable discretion in enforcing the statute.

Other aspects of the statutory scheme also suggest that Congress did not intend to deny courts the discretion to rely on remedies other than an immediate prohibitory injunction. Although the ultimate objective of the FWPCA is to eliminate all discharges of pollutants into the navigable waters by 1985, the statute sets forth a scheme of phased compliance. As enacted, it called for the achievement of the "best practicable control technology currently available" by July 1, 1977, and the "best available technology economically achievable" by July 1, 1983. 33 U. S. C. § 1311(b). This scheme of phased compliance further suggests that this is a statute in which Congress envisioned, rather than curtailed, the exercise of discretion.[11]

---

to transform generally applicable effluent limitations and other standards—including those based on water quality—into the obligations (including a timetable for compliance) of the individual discharger, and the Amendments provide for direct administrative and judicial enforcement of permits. . . . With few exceptions, for enforcement purposes a discharger in compliance with the terms and conditions of an NPDES permit is deemed to be in compliance with those sections of the Amendments on which the permit conditions are based. . . . In short, the permit defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations under the Amendments." *EPA* v. *California ex rel. State Water Resources Control Board,* 426 U. S. 200, 205 (1976) (footnote omitted).

[11] We have, however, held some standards related to phased compliance to be absolute. See *EPA* v. *National Crushed Stone Assn.,* 449 U. S. 64 (1980). In *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.,* 453 U. S. 1 (1981), we concluded that the federal common law of nuisance was pre-empted by the FWPCA and other similar

The FWPCA directs the Administrator of the EPA to seek an injunction to restrain immediately discharges of pollutants he finds to be presenting "an imminent and substantial endangerment to the health of persons or to the welfare of persons." 33 U. S. C. § 1364(a) (1976 ed., Supp. IV). This rule of immediate cessation, however, is limited to the indicated class of violations. For other kinds of violations, the FWPCA authorizes the Administrator of the EPA "to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order . . . ." 33 U. S. C. § 1319(b).[12] The provision makes clear that Congress did not

Acts: "In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." *Id.*, at 15; see *Milwaukee* v. *Illinois*, 451 U. S. 304 (1981). But, as we have also observed in construing this Act: "The question . . . is not what a court thinks is generally appropriate to the regulatory process, it is what Congress intended . . . ." *E. I. du Pont de Nemours & Co.* v. *Train*, 430 U. S., at 138. Here we do not read the FWPCA as intending to abolish the courts' equitable discretion in ordering remedies.

[12] The statute at issue in *Hecht Co.* v. *Bowles*, 321 U. S. 321 (1944), contained language very similar to that in § 1319(b). It directed the Price Administrator to seek "a permanent or temporary injunction, restraining order, or other order" to halt violations. *Id.*, at 322. The Court determined that such statutory language did not require the court to issue an injunction even when the Administrator had sued for injunctive relief. In *Hecht Co.*, the court's equitable discretion overrode that of the Administrator. If a court can properly refuse an injunction in the circumstances of *Hecht Co.*, the exercise of its discretion seems clearly appropriate in a case such as this, where the EPA Administrator was not a party and had not yet expressed his judgment. The action of the District Court permitted it to obtain the benefit of the EPA's recommendation before deciding to enjoin the discharge.

In *Hecht Co.*, unlike here, the violations had ceased by the time the injunction was sought. The Court, however, explained that "the cessation of violations, whether before or after the institution of a suit by the Administrator, is no bar to the issuance of an injunction." *Id.*, at 327. Thus, contrary to the dissent's characterization, *post*, at 327–328, the Court did not base its decision on the fact that violations had ceased.

anticipate that all discharges would be immediately enjoined. Consistent with this view, the administrative practice has not been to request immediate cessation orders. "Rather, enforcement actions typically result, by consent or otherwise, in a remedial order setting out a detailed schedule of compliance designed to cure the identified violation of the Act." Brief for Petitioners 17. See *Milwaukee* v. *Illinois*, 451 U. S. 304, 320–322 (1981). Here, again, the statutory scheme contemplates equitable consideration.

Both the Court of Appeals and respondents attach particular weight to the provision of the FWPCA permitting the President to exempt federal facilities from compliance with the permit requirements. 33 U. S. C. § 1323(a) (1976 ed., Supp. IV).[13] They suggest that this provision indicates congressional intent to limit the court's discretion. According to respondents, the exemption provision evidences Congress' determination that only paramount national interests justify failure to comply and that only the President should make this judgment.

We do not construe the provision so broadly. We read the FWPCA as permitting the exercise of a court's equitable discretion, whether the source of pollution is a private party or a federal agency, to order relief that will achieve *compliance* with the Act. The exemption serves a different and complementary purpose, that of permitting *noncompliance* by federal agencies in extraordinary circumstances. Executive Order No. 12088, 3 CFR 243 (1979), which implements the exemption authority, requires the federal agency requesting such an exemption to certify that it cannot meet the applicable pollution standards. "Exemptions are granted by the President only if the conflict between pollution control standards and crucial federal activities cannot be resolved through the development of a practicable remedial program." Brief for Petitioners 26, n. 30.

---

[13] See n. 6, *supra.*

Should the Navy receive a permit here, there would be no need to invoke the machinery of the Presidential exemption. If not, this course remains open. The exemption provision would enable the President, believing paramount national interests so require, to authorize discharges which the District Court has enjoined. Reading the statute to permit the exercise of a court's equitable discretion in no way eliminates the role of the exemption provision in the statutory scheme.

Like the language and structure of the Act, the legislative history does not suggest that Congress intended to deny courts their traditional equitable discretion. Congress passed the 1972 Amendments because it recognized that "the national effort to abate and control water pollution has been inadequate in every vital aspect." S. Rep. No. 92–414, p. 7 (1971). The past failings included enforcement efforts under the Rivers and Harbors Appropriation Act of 1899 (Refuse Act), 33 U. S. C. § 401 *et seq.* The "major purpose" of the 1972 Amendments was "to establish a comprehensive long-range policy for the elimination of water pollution." S. Rep. No. 92–414, *supra,* at 95. The permit system was the key to that policy. "The Amendments established a new system of regulation under which it is illegal for anyone to discharge pollutants into the Nation's waters except pursuant to a permit." *Milwaukee* v. *Illinois, supra,* at 310–311; see generally *EPA* v. *California ex rel. State Water Resources Control Board,* 426 U. S. 200 (1976). Nonetheless, "[i]n writing the enforcement procedures involving the Federal Government the Committee drew extensively . . . upon the existing enforcement provisions of the Refuse Act of 1899." S. Rep. No. 92–414, *supra,* at 63. Violations of the Refuse Act have not automatically led courts to issue injunctions. See *Reserve Mining Co.* v. *EPA,* 514 F. 2d 492, 535–538 (CA8 1975); *United States* v. *Rohm & Haas Co.,* 500 F. 2d 167, 175 (CA5 1974), cert. denied, 420 U. S. 962 (1975); *United States* v. *Kennebec Log Driving Co.,* 491 F. 2d 562, 571 (CA1 1973), on remand, 399 F. Supp. 754, 759–760 (Me. 1975).

III

This Court explained in *Hecht Co.* v. *Bowles*, 321 U. S. 321 (1944), that a major departure from the long tradition of equity practice should not be lightly implied. As we did there, we construe the statute at issue "in favor of that interpretation which affords a full opportunity for equity courts to treat enforcement proceedings . . . in accordance with their traditional practices, as conditioned by the necessities of the public interest which Congress has sought to protect." *Id.*, at 330. We do not read the FWPCA as foreclosing completely the exercise of the court's discretion. Rather than requiring a district court to issue an injunction for any and all statutory violations, the FWPCA permits the district court to order that relief it considers necessary to secure prompt compliance with the Act. That relief can include, but is not limited to, an order of immediate cessation.

The exercise of equitable discretion, which must include the ability to deny as well as grant injunctive relief, can fully protect the range of public interests at issue at this stage in the proceedings. The District Court did not face a situation in which a permit would very likely not issue, and the requirements and objective of the statute could therefore not be vindicated if discharges were permitted to continue. Should it become clear that no permit will be issued and that compliance with the FWPCA will not be forthcoming, the statutory scheme and purpose would require the court to reconsider the balance it has struck.

Because Congress, in enacting the FWPCA, has not foreclosed the exercise of equitable discretion, the proper standard for appellate review is whether the District Court abused its discretion in denying an immediate cessation order while the Navy applied for a permit. We reverse and remand to the Court of Appeals for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, concurring.

I join the opinion of the Court. In my view, however, the record clearly establishes that the District Court in this case did not abuse its discretion by refusing to enjoin the immediate cessation of all discharges. Finding that the District Court acted well within the equitable discretion left to it under the Federal Water Pollution Control Act (FWPCA), I would remand the case to the Court of Appeals with instructions that the decision of the District Court should be affirmed.*

The propriety of this disposition is emphasized by the dissenting opinion of JUSTICE STEVENS, *post*, p. 322. I agree with his view that Congress may limit a court's equitable discretion in granting remedies under a particular statute, and that some statutes may constrain discretion more narrowly than others. I stand with the Court, however, in finding no indication that Congress intended to limit the court's equitable discretion under the FWPCA in the manner suggested by JUSTICE STEVENS. As the Court's remand order might be thought to leave open whether the District Court in this case acted within its range of permissible discretion under the

---

*The District Court's thorough opinion demonstrates the reasonableness of its decision in light of all pertinent factors, including of course the evident purpose of the statute. The District Court concluded as matters of fact that the Navy's violations have caused no "appreciable harm," *Romero-Barcelo* v. *Brown*, 478 F. Supp. 646, 706 (PR 1979), and indeed that the Navy's control of the area "probably constitutes a positive factor in its over all ecology," *id.*, at 682. Moreover, the District Court found it "abundantly clear from the evidence in the record . . . that the training that takes place in Vieques is vital to the defense of the interests of the United States." *Id.*, at 707. Balancing the equities as they then stood, the District Court declined to order an *immediate* cessation of all violations but nonetheless issued affirmative orders aimed at securing compliance with the law. See *id.*, at 708. As I read its opinion, the District Court did not foreclose the possibility of ordering further relief that might become appropriate under changed circumstances at a later date.

FWPCA, it would promote both clarity and economy for us to hold now that the District Court did not abuse its discretion and that its decision should be reinstated.

JUSTICE STEVENS, dissenting.

The appropriate remedy for the violation of a federal statute depends primarily on the terms of the statute and the character of the violation. Unless Congress specifically commands a particular form of relief, the question of remedy remains subject to a court's equitable discretion.[1] Because the Federal Water Pollution Control Act does not specifically command the federal courts to issue an injunction every time an unpermitted discharge of a pollutant occurs, the Court today is obviously correct in asserting that such injunctions should not issue "automatically" or "mechanically" in every case. It is nevertheless equally clear that by enacting the 1972 Amendments to the FWPCA Congress channeled the discretion of the federal judiciary much more narrowly than the Court's rather glib opinion suggests. Indeed, although there may well be situations in which the failure to obtain an NPDES permit would not require immediate cessation of all discharges, I am convinced that Congress has circumscribed the district courts' discretion on the question of remedy so narrowly that a general rule of immediate cessation must be applied in all but a narrow category of cases. The Court of Appeals was quite correct in holding that this case does not present the kind of exceptional situation that justifies a departure from the general rule.

The Court's mischaracterization of the Court of Appeals' holding is the premise for its essay on equitable discretion. This essay is analytically flawed because it overlooks the limitations on equitable discretion that apply in cases in which public interests are implicated and the defendant's violation

---

[1] Cf. *Steelworkers* v. *United States*, 361 U. S. 39, 54–59 (Frankfurter and Harlan, JJ., concurring).

of the law is ongoing. Of greater importance, the Court's opinion grants an open-ended license to federal judges to carve gaping holes in a reticulated statutory scheme designed by Congress to protect a precious natural resource from the consequences of ad hoc judgments about specific discharges of pollutants.

I

Contrary to the impression created by the Court's opinion, the Court of Appeals did not hold that the District Court was under an absolute duty to require compliance with the FWPCA "under any and all circumstances," *ante*, at 313, or that it was "mechanically obligated to grant an injunction for every violation of law," *ibid*. The only "absolute duty" that the Court of Appeals mentioned was the Navy's duty to obtain a permit before discharging pollutants into the waters off Vieques Island.[2] In light of the Court's opinion the point is worth repeating—the Navy, like anyone else,[3] must obey the law.

---

[2] "Whether or not the Navy's activities in fact harm the coastal waters, it has an absolute statutory obligation to stop any discharges of pollutants until the permit procedure has been followed and the Administrator of the Environmental Protection Agency, upon review of the evidence, has granted a permit." *Romero-Barcelo* v. *Brown*, 643 F. 2d 835, 861 (CA1 1981).

This statement by the Court of Appeals is entirely consistent with the comments in the Senate Report on the legislation that "[e]nforcement of violations . . . should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or delay," and that "the issue before the courts would be a factual one of whether there had been compliance." S. Rep. No. 92–414, pp. 64, 80 (1971).

[3] The statute expressly subjects federal agencies to all laws "respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity." 33 U. S. C. § 1323(a) (1976 ed., Supp. IV). Indeed, Congress required federal agencies "to provide national leadership in the control of water pollution," S. Rep. No. 92–414, *supra*, at 67, and to "be a model for the Nation," H. R. Rep. No. 92–911, p. 118 (1972).

The Court of Appeals did not hold that the District Court had no discretion in formulating remedies for statutory violations. It merely "conclude[d] that the district court erred in undertaking a traditional balancing of the parties' competing interests." *Romero-Barcelo* v. *Brown*, 643 F. 2d 835, 861 (CA1 1981). The District Court was not free to disregard the "congressional ordering of priorities" and "the judiciary's 'responsibility to protect the integrity of the . . . process mandated by Congress.'" *Ibid.* (quoting *Jones* v. *Lynn*, 477 F. 2d 885, 892 (CA1 1973)). The Court of Appeals distinguished a statutory violation that could be deemed merely "technical" from the Navy's "[utter disregard of] the statutory mandate." 643 F. 2d, at 861–862. It then pointed out that an order prohibiting any discharge of ordnance into the coastal waters off Vieques until an NPDES permit was obtained would not significantly affect the Navy's training operations because most, if not all, of the Navy's targets were land-based. *Id.*, at 862, n. 55. Finally, it noted that the statute authorized the Navy to obtain an exemption from the President if an injunction would have a significant effect on national security. *Id.*, at 862; see 33 U. S. C. § 1323(a) (1976 ed., Supp. IV).

Under these circumstances—the statutory violation is blatant and not merely technical, and the Navy's predicament was foreseen and accommodated by Congress—the Court of Appeals essentially held that the District Court retained no discretion to deny an injunction. The discretion exercised by the District Court in this case was wholly at odds with the intent of Congress in enacting the FWPCA. In essence, the District Court's remedy was a judicial permit exempting the Navy's operations in Vieques from the statute until such time as it could obtain a permit from the Environmental Protection Agency or a statutory exemption from the President. The two principal bases for the temporary judicial permit were matters that Congress did not commit to judicial discretion. First, the District Court was persuaded that the pollu-

tion was not harming the quality of the coastal waters, see *Romero-Barcelo* v. *Brown,* 478 F. Supp. 646, 706–707 (PR 1979); and second, the court was concerned that compliance with the Act might adversely affect national security, see *id.,* at 707–708. The Court of Appeals correctly noted that the first consideration is the business of the EPA[4] and the second is the business of the President.[5]

The Court unfairly uses the Court of Appeals' opinion in this case as a springboard for a lecture on the principles of equitable remedies. The Court of Appeals' reasoning was correct in all respects. It recognized that the statute categorically prohibits discharges of pollutants without a permit. Unlike the Court, see *ante,* at 314–315, it recognized that the requested injunction was the only remedy that would bring the Navy into compliance with the statute on Congress' timetable.[6] It then demonstrated that none of the reasons of-

---

[4] "Not only are the technical problems difficult—doubtless the reason Congress vested authority to administer the Act in administrative agencies possessing the necessary expertise—but the general area is particularly unsuited to the approach inevitable under a regime of federal common law. Congress criticized past approaches to water pollution control as being 'sporadic' and 'ad hoc,' S. Rep. No. 92–414, p. 95 (1971), 2 Leg. Hist. 1511, apt characterizations of any judicial approach applying federal common law, see *Wilburn Boat Co.* v. *Fireman's Fund Ins. Co.,* 348 U. S. 310, 319 (1955)." *Milwaukee* v. *Illinois,* 451 U. S. 304, 325.

[5] In my opinion the national security considerations that were persuasive to the District Court are not matters that are suitable for judicial evaluation. Congress has wisely given the President virtually unlimited authority to exempt the military from the statute on national defense grounds. If those grounds justify an exemption in this case, the Navy clearly should have obtained it from its Commander in Chief, not from a judge unlearned in such matters. This Court, however, makes the curious argument that the Presidential exemption was intended to permit *noncompliance* with the statute and therefore merely complements the equitable discretion of a district court also to authorize noncompliance. *Ante,* at 318–319.

[6] The District Court ordered the Navy to file for an NPDES permit "'with all deliberate speed.'" *Romero-Barcelo* v. *Brown,* 478 F. Supp. 646, 708 (PR 1979) (quoting *Brown* v. *Board of Education,* 349 U. S. 294, 301).

fered by the District Court for refusing injunctive relief was consistent with the statute or was compelling under the circumstances. The position of the Court of Appeals in effect was that the federal courts' equitable discretion is constrained by a strong presumption in favor of enforcing the law as Congress has written it. By reversing, the Court casts doubt on the validity of that position. This doubt is especially dangerous in the environmental area, where the temptations to delay compliance are already substantial.[7]

## II

Our cases concerning equitable remedies have repeatedly identified two critical distinctions that the Court simply ignores today. The first is the distinction between cases in which only private interests are involved and those in which a requested injunction will implicate a public interest. Second, within the category of public interest cases, those cases in which there is no danger that a past violation of law will recur have always been treated differently from those in which an existing violation is certain to continue.

*Yakus* v. *United States*, 321 U. S. 414, illustrates the first distinction. The Court there held that Congress constitutionally could preclude a private party from obtaining an injunction against enforcement of federal price control regulations pending an adjudication of their validity. In any balancing process, the Court explained, special deference must be given to the public interest:

---

[7] It is ironic that the Court comes to the aid of the Navy even though Congress authorized an executive exemption for federal (particularly military) operations but no analogous exemption for important private activities, and even though Congress intended federal agencies to assume a leadership role in the water pollution control effort. To paraphrase the Senate Report, the Federal Government cannot expect private industry to obey the law by ceasing discharges of pollutants until a permit is obtained if the Federal Government is not willing to obey the same law or at least invoke a statutory exemption. See S. Rep. No. 92–414, p. 67 (1971).

"Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. . . .

"But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Id.*, at 440 (footnote omitted).

In that case, the public interest, reflected in an Act of Congress, was in opposition to the availability of injunctive relief. The Court stated, however, that the public interest factor would have the same special weight if it favored the granting of an injunction:

"This is but another application of the principle, declared in *Virginia Ry. Co.* v. *System Federation*, 300 U. S. 515, 552, that 'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" *Id.*, at 441.

*Hecht Co.* v. *Bowles*, 321 U. S. 321, which the Court repeatedly cites, did involve an attempt to obtain an injunction against future violations of a federal statute. That case fell into the category of cases in which a past violation of law had been found and the question was whether an injunction should issue to prevent future violations. Cf. *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 633–636; *United States* v. *Oregon Medical Society*, 343 U. S. 326, 332–334. Because the record established that the past violations were inadvert-

ent, that they had been promptly terminated, and that the defendant had taken vigorous and adequate steps to prevent any recurrence, the Court held that the District Court had discretion to deny injunctive relief. But in reaching that conclusion, the Court made it clear that judicial discretion "must be exercised in light of the large objectives of the Act. For the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases." 321 U. S., at 331. Indeed, the Court emphasized that any exercise of discretion "should reflect an acute awareness of the Congressional admonition" in the statute at issue. *Ibid.*

In contrast to the decision in *Hecht*, today the Court pays mere lipservice to the statutory mandate and attaches no weight to the fact that the Navy's violation of law has not been corrected.[8] The Court cites no precedent for its holding that an ongoing deliberate violation of a federal statute should be treated like any garden-variety private nuisance action in which the chancellor has the widest discretion in fashioning relief.[9]

Our prior cases involving the appropriate remedy for an ongoing violation of federal law establish a much more stringent test than the Court applies today. Thus, in *United States* v. *City and County of San Francisco*, 310 U. S. 16, a case in which the Government claimed that the city's disposition of electric power was prohibited by an Act of Congress, the Court held that "this case does not call for a balancing of equities or for the invocation of the generalities of judicial maxims in order to determine whether an injunction should have issued." *Id.*, at 30. "The equitable doctrines relied on do not militate against the capacity of a court of equity as a

---

[8] The Navy has been in continuous violation of the statute during the entire decade since its enactment.

[9] Indeed, I am unaware of any case in which the Court has permitted a statutory violation to continue.

proper forum in which to make a declared policy of Congress effective." *Id.*, at 31. An injunction to prohibit continued violation of that policy "is both appropriate and necessary." *Ibid.*[10]

In *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, the Court plainly stated that an equitable remedy for the violation of a federal statute was neither automatic on the one hand, nor simply a matter of balancing the equities on the other.[11] *Albemarle* holds that the district court's remedial

---

[10] In the steel seizure case, Justice Frankfurter rejected "the Government's argument that overriding public interest prevents the issuance of the injunction despite the illegality of the seizure":

" 'Balancing the equities' when considering whether an injunction should issue, is lawyers' jargon for choosing between conflicting public interests. When Congress itself has struck the balance, has defined the weight to be given the competing interests, a court of equity is not justified in ignoring that pronouncement under the guise of exercising equitable discretion." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 609–610 (concurring opinion).

[11] "The petitoners contend that the statutory scheme provides no guidance, beyond indicating that backpay awards are within the District Court's discretion. We disagree. It is true that backpay is not an automatic or mandatory remedy; like all other remedies under the Act, it is one which the courts 'may' invoke. The scheme implicitly recognizes that there may be cases calling for one remedy but not another, and—owing to the structure of the federal judiciary—these choices are, of course, left in the first instance to the district courts. However, such discretionary choices are not left to a court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles.' *United States* v. *Burr*, 25 F. Cas. 30, 35 (No. 14,692d) (CC Va. 1807) (Marshall, C. J.). The power to award backpay was bestowed by Congress, as part of a complex legislative design directed at a historic evil of national proportions. A court must exercise this power 'in light of the large objectives of the Act,' *Hecht Co.* v. *Bowles*, 321 U. S. 321, 331 (1944). That the court's discretion is equitable in nature, see *Curtis* v. *Loether*, 415 U. S. 189, 197 (1974), hardly means that it is unfettered by meaningful standards or shielded from thorough appellate review. In *Mitchell* v. *DeMario Jewelry*, 361 U. S. 288, 292 (1960), this Court held, in the face of a silent statute, that

decision must be measured against the purposes that inform the Act of Congress that has been violated. *Id.*, at 417.

### III

The Court's discussion of the FWPCA creates the impression that Congress did not intend any significant change in the enforcement provisions of the Rivers and Harbors Appropriation Act of 1899. See *ante*, at 319. The Court goes so far as to suggest that the FWPCA is little more than a codification of the common law of nuisance.[12] The contrast between this casual attitude toward the FWPCA and the Court's writing in *Milwaukee* v. *Illinois*, 451 U. S. 304, is stark. In that case the Court refused to allow federal judges to supplement the statutory enforcement scheme by enjoining a nuisance, whereas in this case the question is whether a federal judge may create a loophole in the scheme by refusing

---

district courts enjoyed the 'historic power of equity' to award lost wages to workmen unlawfully discriminated against under § 17 of the Fair Labor Standards Act of 1938, 52 Stat. 1069, as amended, 29 U. S. C. § 217 (1958 ed.). The Court simultaneously noted that 'the statutory purposes [leave] little room for the exercise of discretion not to order reimbursement.' 361 U. S., at 296.

"It is true that '[e]quity eschews mechanical rules . . . [and] depends on flexibility.' *Holmberg* v. *Armbrecht*, 327 U. S. 392, 396 (1946). But when Congress invokes the Chancellor's conscience to further transcendent legislative purposes, what is required is the principled application of standards consistent with those purposes and not 'equity [which] varies like the Chancellor's foot.' Important national goals would be frustrated by a regime of discretion that 'produce[d] different results for breaches of duty in situations that cannot be differentiated in policy.' *Moragne* v. *States Marine Lines*, 398 U. S. 375, 405 (1970)." *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 415–417 (footnotes omitted).

[12] "The objective of this statute is in some respects similar to that sought in nuisance suits, where courts have fully exercised their equitable discretion and ingenuity in ordering remedies. *E. g., Spur Industries, Inc.* v. *Del E. Webb Development Co.*, 108 Ariz. 178, 494 P. 2d 700 (1972); *Boomer* v. *Atlantic Cement Co.*, 26 N. Y. 2d 219, 257 N. E. 2d 870 (1970)." *Ante,* at 314, n. 7.

to enjoin a violation. Why a different standard should be used to define the scope of judicial discretion in these two situations is not explained.

In *Milwaukee* v. *Illinois* the Court described the FWPCA in these terms:

> "The statutory scheme established by Congress provides a forum for the pursuit of such claims before expert agencies by means of the permit-granting process. It would be quite inconsistent with this scheme if federal courts were in effect to 'write their own ticket' under the guise of federal common law after permits have already been issued and permittees have been planning and operating in reliance on them." *Id.*, at 326.

Ironically, today the Court holds that federal district courts may in effect "write their own ticket" under the guise of federal common law *before* permits have been issued.

The Court distinguishes *TVA* v. *Hill*, 437 U. S. 153, on the ground that the Endangered Species Act contained a "flat ban" on the destruction of critical habitats. *Ante*, at 314. But the statute involved in this case also contains a flat ban against discharges of pollutants into coastal waters without a permit.[13] Surely the congressional directive to protect the

---

[13] Indeed, this proposition has been consistently, repeatedly, and unequivocally reaffirmed by this Court:

"The discharge of 'pollutants' into water is unlawful without a permit issued by the Administrator of the EPA or, if a State has developed a program that complies with the FWPCA, by the State." *Train* v. *Colorado Public Interest Research Group*, 426 U. S. 1, 7.

"Under the NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms." *EPA* v. *California ex rel. State Water Resources Control Board*, 426 U. S. 200, 205.

"We conclude that, at least so far as concerns the claims of respondents, Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rather has occupied the

Nation's waters from gradual but possibly irreversible contamination is no less clear than the command to protect the snail darter.[14] To assume that Congress has placed a greater value on the protection of vanishing forms of animal life than on the protection of our water resources is to ignore the text, the legislative history,[15] and the previously consistent interpretation of this statute.[16]

It is true that in *TVA* v. *Hill* there was no room for compromise between the federal project and the statutory objective to preserve an endangered species; either the snail

---

field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." *Milwaukee* v. *Illinois*, 451 U. S., at 317.

In *EPA* v. *National Crushed Stone Assn.*, 449 U. S. 64, the Court read the "plain language of the statute," *id.*, at 73, to require private firms "either to conform to BPT standards or to cease production." *Id.*, at 76.

[14] "Congress' intent in enacting the Amendments was clearly to establish an all-encompassing program of water pollution regulation. *Every* point source discharge is prohibited unless covered by a permit, which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goals." *Milwaukee* v. *Illinois*, *supra*, at 318 (emphasis in original; footnote omitted).

[15] The Senate Report emphasized that "if the timetables established throughout the Act are to be met, the threat of sanction must be real, and enforcement provisions must be swift and direct." S. Rep. No. 92–414, p. 65 (1971).

[16] "The establishment of such a self-consciously comprehensive program by Congress, which certainly did not exist when *Illinois* v. *Milwaukee*[, 406 U. S. 91,] was decided, strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." *Milwaukee* v. *Illinois*, *supra*, at 319.

Today's holding that a federal court has inherent power to grant exemptions from the statutory permit requirement presents a dramatic contrast with the holding in *Milwaukee* v. *Illinois:*

"Federal courts lack authority to impose more stringent effluent limitations under federal common law than those imposed by the agency charged by Congress with administering this comprehensive scheme." 451 U. S., at 320.

darter or the completion of the Tellico Dam had to be sacrificed. In the FWPCA, the Court tells us, the congressional objective is to protect the integrity of the Nation's waters, not to protect the integrity of the permit process. *Ante*, at 314. Therefore, the Court continues, *ante*, at 315, a federal court may compromise the process chosen by Congress to protect our waters as long as the court is content that the waters are not actually being harmed by the particular discharge of pollutants.

On analysis, however, this reasoning does not distinguish the two cases. Courts are in no better position to decide whether the permit process is necessary to achieve the objectives of the FWPCA than they are to decide whether the destruction of the snail darter is an acceptable cost of completing the Tellico Dam. Congress has made both decisions, and there is nothing in the respective statutes or legislative histories to suggest that Congress invited the federal courts to second-guess the former decision any more than the latter.

A disregard of the respective roles of the three branches of government also tarnishes the Court's other principal argument in favor of expansive equitable discretion in this area.[17] The Court points out that Congress intended to halt water pollution gradually, not immediately, and that "the scheme as a whole contemplates the exercise of discretion and balancing of equities." *Ante*, at 316. In the Court's words, Congress enacted a "scheme of phased compliance." *Ibid.* Equitable discretion in enforcing the statute, the Court states, is therefore consistent with the statutory scheme.

The Court's sophistry is premised on a gross misunderstanding of the statutory scheme. Naturally, in 1972 Congress did not expect dischargers to end pollution immediately.[18] Rather, it entrusted to expert administrative

---

[17] See also n. 5, *supra*.

[18] "The Committee believes that the no-discharge declaration in Section 13 of the 1899 Refuse Act is useful as an enforcement tool. Therefore, this

agencies the task of establishing timetables by which dischargers could reach that ultimate goal. These timetables are determined by the agencies and included in the NPDES permits; the conditions in the permits constitute the terms by which compliance with the statute is measured.[19] Quite obviously, then, the requirement that each discharger subject itself to the permit process is crucial to the operation of the "scheme of phased compliance." By requiring each discharger to obtain a permit *before* continuing its discharges of pollutants, Congress demonstrated an intolerance for delay in compliance with the statute. It is also obvious that the "exercise of discretion and balancing of equities" were tasks delegated by Congress to expert agencies, not to federal courts, yet the Court simply ignores the difference.

## IV

The decision in *TVA* v. *Hill* did not depend on any peculiar or unique statutory language. Nor did it rest on any special interest in snail darters. The decision reflected a profound

---

section [§ 301] declares the discharge of pollutants unlawful. The Committee believes it is important to clarify this point: No one has the right to pollute.

"But the Committee recognizes the impracticality of any effort to halt all pollution immediately. Therefore, this section provides an exception if the discharge meets the requirements of this section, Section 402, and others listed in the bill." S. Rep. No. 92–414, *supra*, at 43.

[19] "An NPDES permit serves to transform generally applicable effluent limitations and other standards—including those based on water quality—into the obligations (including a timetable for compliance) of the individual discharger, and the Amendments provide for direct administrative and judicial enforcement of permits. With few exceptions, for enforcement purposes a discharger in compliance with the terms and conditions of an NPDES permit is deemed to be in compliance with those sections of the Amendments on which the permit conditions are based. In short, the permit defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations under the Amendments." *EPA* v. *California ex rel. State Water Resources Control Board*, 426 U. S., at 205 (citations omitted).

respect for the law and the proper allocation of lawmaking responsibilities in our Government.[20]   There we refused to sit as a committee of review.   Today the Court authorizes freethinking federal judges to do just that.   Instead of requiring adherence to carefully integrated statutory procedures that assign to nonjudicial decisionmakers the responsibilities for evaluating potential harm to our water supply as well as potential harm to our national security, the Court unnecessarily and casually substitutes the chancellor's clumsy foot for the rule of law.

I respectfully dissent.

---

[20] "Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute.   Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end.   We do not sit as a committee of review, nor are we vested with the power of veto.   The lines ascribed to Sir Thomas More by Robert Bolt are not without relevance here:

" 'The law, Roper, the law.   I know what's legal, not what's right.   And I'll stick to what's legal. . . . I'm *not* God.   The currents and eddies of right and wrong, which you find such plain-sailing, I can't navigate, I'm no voyager.   But in the thickets of the law, oh there I'm a forester. . . . What would you do?   Cut a great road through the law to get after the Devil? . . . And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? . . . This country's planted thick with laws from coast to coast—Man's laws, not God's—and if you cut them down . . . d'you really think you could stand upright in the winds that would blow then? . . . Yes, I'd give the Devil benefit of law, for my own safety's sake.'   R. Bolt, A Man for All Seasons, Act I, p. 147 (Three Plays, Heinemann ed. 1967).

"We agree with the Court of Appeals that in our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with 'common sense and the public weal.'   Our Constitution vests such responsibilities in the political branches."   *TVA* v. *Hill*, 437 U. S. 153, 194–195.