**INTEREL ENVIRONMENTAL TECHNOLOGIES, INC., on behalf of itself and all other persons entitled to share in funds allocated for the improvements and reconstruction of the Glen Cove Co-disposal/Energy Recovery Facility, Plaintiffs,**

v.

**UNITED JERSEY BANK, Island Recycling and Environmental Corp., City of Glen Cove, the Glen Cove Industrial Development Agency and Allstate Insurance Company, Defendants.**

No. CV 95–2928(ADS).

United States District Court, E.D. New York.

Aug. 11, 1995.

Jaspan, Ginsberg, Schlesinger, Silverman & Hoffman by Laurel R. Kretzing, Garden City, NY, for plaintiff.

Elias, Goodman & Shanks by Dan Elias, New York City, for defendant Island Recycling and Environmental Corp.

Robinson, St. John & Wayne by David W. Phillips, New York City, for defendant United Jersey Bank.

Twomey, Latham, Shea & Kelley by Jeffrey Lee Snead, Riverhead, NY, for defendants City of Glen Cove and the Glen Cove Industrial Development Com'n.

Herrick Feinstein LLP by John Goldman, New York City, for defendant Allstate Ins. Co.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge:

The plaintiff INTEREL Environmental Technologies, Inc. ("Interel") brings this diversity action on behalf of itself and as a representative of approximately twenty five other subcontractors to recover monies allegedly due for construction work performed for the defendants. Presently, before the Court is the plaintiff's motion for a preliminary injunction to enjoin the defendant Allstate Insurance Co. ("Allstate") from withdrawing monies held in a fund that has been allegedly designated to pay the plaintiff and the other subcontractors for their construction costs.

## BACKGROUND AND COMPLAINT

### 1. Financing and Rehabilitating the City of Glen Cove Co–Disposal/Energy Recovery Facility.

The City of Glen Cove Co–Disposal/Energy Recovery Facility (the "Facility"), located in Glen Cove, New York, is a modern day "waste-to-energy" plant. Owned by the City of Glen Cove ("City" or "Glen Cove"), the Facility essentially recovers energy from the burning of municipal solid waste (garbage) and sewer sludge collected from the City and other towns in Nassau County. The heat from the burning is captured, transformed to electricity, and used to power the Facility, which also includes a Water Pollution Control plant for treating certain wastewaters discharged and collected by Glen Cove.

In July 1991, the Facility was temporarily shut down because it failed to meet certain air emission standards that had been set forth in a 1990 Consent Order entered into between, among others, the New York State Department of Environmental Conservation ("DEC") and Glen Cove ("Consent Order"). The Consent Order required that certain improvements be made at the Facility in order to reduce the emission of air pollutants from the Facility. Glen Cove received bids for an operator of the Facility, and chose the defendant Island Recycling and Environmental Corp. ("Island Recycling") to operate the Facility.

Glen Cove and Island Recycling entered into a management agreement on July 20, 1992 ("Management Agreement"), pursuant to which Island Recycling agreed to "operate, maintain and manage" the Facility as an independent contractor for a term of twenty years, commencing on August 1, 1992. In order to meet the requirements of the Consent Order and to otherwise comply with the environmental statutes and regulations governing the Facility, Article 10 of the Management Agreement provides that Island Recycling shall rehabilitate the Facility by reconstructing whatever is necessary to bring the Facility into conformance with the Consent Order, at its sole cost and expense. The parties call this reconstruction and any accompanying improvements the "Improvements" to the Facility. Island Recycling was also required to obtain a $2 million performance bond in favor of the City.

To finance the reconstruction at the Facility, Island Recycling borrowed funds from the defendant Glen Cove Industrial Development Agency ("Agency"), a New York public benefit agency, which raised the funds by issuing special obligation revenue bonds. According to the plaintiff, the defendant Allstate is the sole or majority bondholder. In exchange for raising the funds to finance the reconstruction, the Agency and Island Recycling entered into a lease agreement dated April 1, 1993 ("Lease Agreement"), pursuant to which title to all Improvements in the Facility are held by the Agency, and the Improvements are leased to Island Recycling in exchange for rent payments made to the Agency.

At the same time that Island Recycling and the Agency entered into the Lease Agreement, the City granted a sub-license of the Facility from Island Recycling to the Agency, and approved an assignment of certain payments Island Recycling was to receive from the City under the Management Agreement to the Agency.

The proceeds raised from the bond issue were to be used to pay for the construction costs at the Facility. Pursuant to a trust indenture between the Agency and the defendant United Jersey Bank as Trustee ("Trust Indenture"), a $12 million fund was established for the purpose of paying for the construction of Improvements at the Facility ("Fund"). According to the section 3 of the Lease Agreement and a procedure outlined by the United Jersey Bank ("Trustee" or "Bank"), requests for reimbursements of work at the Facility by subcontractors were to be first submitted to Island Recycling for approval. If approved by Island Recycling, the reimbursement request would be submitted to engineers hired by Glen Cove for approval. If approved by Glen Cove, Island Recycling would submit the reimbursement request to the Trustee, which would pay the money to Island Recycling, who in turn would pay the subcontractor.

In addition, to provide security to the Bondholder, under the terms of the Trust

Indenture the Agency assigned its rights to the rent payments from Island Recycling to the Bank for the benefit of the bondholders. For the benefit of the bondholder, the Trustee also perfected UCC–1 financing statements evidencing a security interest in the Fund by filing the statements with the Clerk of Nassau County, on May 7, 1993.

According to the plaintiff, on August 16, 1993 the Bank represented to Island Recycling's subcontractors that it was ready to start making payments from the Fund to Island Recycling for payment of the reconstruction costs.

### 2. The Island Recycling–Interel Contract and Events Precipitating the Present Dispute.

In an agreement dated September 30, 1993 (the "contract"), Island Recycling agreed to purchase and the plaintiff Interel agreed to install certain air pollution control and related equipment. The price for the job was $1,735,433.

Relying on the contract and the other agreements governing the Facility and payment for the reconstruction, namely the Management Agreement, Lease Agreement, and Trust Indenture, Interel commenced work at the Facility. From September through December, 1993, Interel submitted applications for four progress payments to Island Recycling for work performed at the Facility. Each application for payment was approved by Island Recycling, then included in a disbursement request to Glen Cove which was approved by Glen Cove's engineers, and ultimately paid from the monies in the Fund.

In January, 1994, a new administration took office in Glen Cove. According to Interel, the new mayor, Thomas Suozzi, opposed reopening the Facility. Eventually, a dispute arose between Glen Cove and Island Recycling and the City refused to authorize the Bank to release monies from the Fund to pay Island Recycling or its subcontractors for work performed at the Facility.

On May 18, 1994, Interel submitted its fifth requisition to Island Recycling in the amount of $583,268 for work performed in January, 1995, prior to the time Glen Cove decided to stop paying for any further construction costs. The requisition was approved by Island Recycling, and sent to the Glen Cove engineers for approval. The engineers approved the requisition, and on July 29, 1994 recommended to the City that Interel's requisition be paid. Glen Cove, however, has not sought the release of Fund monies to Island Recycling so that Interel's requisition can be paid.

In addition to this amount, Interel contends that Island Recycling also approved an additional $296,626 in requisitions, but has not submitted these requisitions to the City for approval. Interel blames the lack of payment of its reimbursement requests on the dispute between Glen Cove and Island Recycling.

According to Interel, because the monies in the Fund are designated to pay for the reconstruction costs of the Facility, the Fund constitutes a trust asset under section 70.1 of the New York State Lien Law. In Interel's view, it and the other subcontractors it represents are entitled to a lien on the Fund pursuant to the Lien Law, to the extent of the amount they are owed by Island Recycling for work performed at the Facility.

On June 17, 1994, Interel filed its notice of lien with the Nassau County Clerk. It also commenced an article 78 proceeding in the New York State Supreme Court, Nassau County to compel the City of Glen Cove to approve and release the monies in the Fund held by the Bank. That action is still pending.

### 3. Interel's Complaint.

Interel alleges that the defendants now intend to withdraw the money in the Fund in order to redeem some or all of the bonds. According to section 3.05(d) of the Lease Agreement, approximately $4.5 million dollars in the Fund were reserved, and are prevented from being disbursed to Island Recycling until, among other things, Island Recycling provides the Bank with a confirmation by the DEC that the Facility is in compliance with the Consent Order and that certain other improvements have been constructed at the Facility. The language of

Section 3.05 of the Lease Agreement states that:

(d) Notwithstanding any provisions to the contrary contained herein, $4,396,359 shall not be disbursed from the Series A Account of the Project Fund and $136,092 (representing a portion of the underwriter's discount) shall not be disbursed from the Series A Account of the Issuance Costs Fund pursuant to this Section 3.05 until such time that, in addition to all other provisions and certificates required under this Section 3.05, (i) the Company receives and provides the Trustee with a true copy of a written confirmation from the DEC stating that the Company has the Facility as required by the Order on Consent and that the Company may resume accepting Processible Water (as defined in the Management Agreement) at the Facility for the purposes of incineration, and (ii) a certification is submitted to the Trustee by an Independent Engineer stating that the installation of the improvements to the north furnace train of the Facility are in substantial compliance with the Company's design criteria as outlined in the Plans.

In the event that Company is unable to comply with the requirements of this subsection on or before July 31, 1995, such undisbursed funds, together with an amount equal to ten percent (10%) of said undisbursed funds which shall be withdrawn from the Debt Service Reserve Fund, shall be used to redeem Series A Bonds pursuant to the provisions of Section 3.01(b) of the Indenture.

Thus, in the event Island Recycling cannot provide such assurances by July 31, 1995, the $4.5 million reserved in the Fund, plus 10% of the undisbursed funds, can be withdrawn and used to redeem the bonds held by Allstate.

Because of the imminence of the bond redemption and the resulting depletion of the Fund, Interel sought relief in this Court, notwithstanding its pending article 78 action in the state court. For some reason, Interel decided not to move in the pending, prior state action. Rather, it commenced a new action in the federal court based on diversity jurisdiction on July 24, 1995, seven days prior to the redemption date and simultaneously filed an Order to Show Cause seeking to enjoin the bond redemption.

According to Interel, if the money is withdrawn to redeem the bonds, it and other subcontractors will not be paid for the work they performed at the Facility. Interel contends that such action by the Bank and Allstate would be a violation of the trust asset created by the Lien Law for the benefit of the subcontractors.

Interel's complaint sets forth six causes of action. The first is a claim under Article 3–A of the New York State Lien Law. Because the Lien Law requires that actions to enforce trusts created under the statute must be undertaken in a representative capacity for all of the subcontractors and materialpersons, Interel has brought this action as a class action, allegedly representing all of the other subcontractors who are owed money which is to be paid from the Fund.

The second cause of action seeks to foreclose on a mechanic's lien it has filed upon the Facility. The third and fourth causes of action state claims for breach of contract by the defendant Island Recycling. The fifth and sixth causes of action state claims for unjust enrichment against, respectively, Island Recycling, the City of Glen Cove and the Agency.

Among the relief Interel seeks is (i) disclosure and an accounting of the use of the monies paid from the Fund, (ii) an injunction against the Bank from redeeming the bonds, (iii) for the Court to take control of the remaining Fund monies and distribute them to those entitled to the monies, and (iv) an award of all of the money it is owed, including an additional $85,188 in retainage, plus storage charges, interest and costs.

## THE PRESENT MOTION

In order to prevent the potential depletion of monies that can be used to pay subcontractors for their work performed at the Facility, Interel's motion seeks to preliminarily enjoin the Bank and the other defendants from withdrawing any monies in the Fund for the purpose of redeeming the bonds, to the extent such a withdrawal will leave an amount in the Fund that is insufficient to

satisfy all the claims of the subcontractors and materialpersons, including costs and attorneys fees.

Interel contacted the defendants to advise them it would seek to enjoin the withdrawal of money from the Fund. In response, the Bank's counsel sent a letter to the plaintiff dated July 20, 1995 stating that "if the July 31, 1995, redemption occurs, there will remain in the [Fund] held by the Bank $5,705,-135.39." The Bank and Allstate estimated that the amount of claims by Island Recycling against the Fund—claims on behalf of itself and its subcontractors—were approximately $3.5 million. The plaintiff proposed entering into a stipulation with the Bank and Allstate, whereby an amount would be kept in the Fund after the bond redemption which would satisfy the claims by Island Recycling. However, the parties could not ensure the amount of the actual claims by Island Recycling on behalf of itself and the other subcontractors. At the time, Island Recycling would not cooperate in disclosing the amount of the claims.

Because Interel still is unsure of the exact amount in the Fund and how many claims exist against the Fund, Interel also seeks an order requiring the Bank and Island Recycling to verify the amount of outstanding claims on the Fund.

The defendant Island Recycling opposes the plaintiff's motion and cross-moves to dismiss the complaint. The defendant Bank, on behalf of itself and Allstate, joins in Island Recycling's opposition and cross-motion.

Essentially, Island Recycling contends that the plaintiff is not entitled to a preliminary injunction, because it has not met the criteria for obtaining such relief: showing (1) irreparable harm, and (2) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See Able v. U.S.*, 44 F.3d 128, 130 (2d Cir. 1995).

According to the defendant, the plaintiff has failed to show irreparable harm because, if it ultimately prevails in this case, it can obtain monetary damages on its contract-based causes of action against one or more of the defendants, and is not limited in its recovery to monies held in the bond Fund.

In addition, the defendant contends that the plaintiff is not likely to succeed on the merits. The defendant points to the contract between Interel and Island Recycling and the terms of the Lease Agreement, which, which according to Island Recycling, make it very clear that (1) the plaintiff cannot be paid until the City of Glen Cove and the Bank approve reimbursement requests, and (2) in order for the bond redemption not to occur on July 31, 1995, Phase 1 of the project must be completed; namely, that Island Recycling provides the Bank with a confirmation by the DEC that the Facility is in compliance with the Consent Order and that certain other improvements have been constructed at the Facility. These conditions have not occurred.

Indeed, Island Recycling contends that part of the reason Phase 1 has not been completed is because of the City of Glen Cove's dissatisfaction with the plaintiff's air emissions control equipment, and the possibility that it will fail to meet air standards regulations. The Court notes that this dissatisfaction is contained in an administrative ruling by the DEC dated May 10, 1995 ("Ruling"), which, among other things, concluded that "it makes no sense to proceed with the installation of improperly sized or designed [Interel] equipment which might result in regular violations of emissions limits, when any errors can be analyzed and corrected for now." *See* Ruling at 13.

The defendants also contend that the plaintiff does not have a cause of action under Article 3–A of the Lien Law, because the construction involves a "public improvement" of real property owned by a municipality, and under New York law a mechanic's lien cannot be filed against the owner of real property owned by a municipality.

The defendants further contend that the issues raised by the plaintiff's motion are not sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships does not tip decidedly toward the plaintiff. Rath-

er, the defendants contend that the balance of hardship tips in favor of them, particularly in favor of the bondholder Allstate who has a right under the various agreements to redeem some of its bonds if Phase 1 is not completed by July 31, 1995.

To compound the matter, the defendants also raise several jurisdictional objections to the plaintiff's motion, and move to dismiss the complaint. First, they contend that the present action cannot be maintained as a class action under Fed.R.Civ.P. 23, because the plaintiff is representing approximately 25 other subcontractors who can easily be joined as parties to this action, and who have interests that are not similar to the plaintiffs. Second, the defendants contend that once class action certification is denied and the other parties are joined as plaintiffs, complete diversity jurisdiction is destroyed, thereby precluding subject matter jurisdiction in this Court under its diversity jurisdiction. Third, the defendants contend that although Interel has been "doing business" in New York, it has done so without the authority of the state, and therefore pursuant to New York Business Corporation Law § 1301(a) and § 1312(a), is not entitled to maintain an action in New York state courts, including a federal court sitting in diversity. Finally, the defendants contend that, because of the pending Article 78 proceeding in the state court, this Court should abstain from hearing this case.

### 1. The July 31, 1995 Hearing.

After hearing the parties' contentions on the return date for the plaintiff's Order to Show Cause, July 31, 1995, the Court determined that the monies reserved under section 3.05(d) for the bond redemption were specifically carved out and set aside under the Lease Agreement and Trust Indenture, to be paid to Allstate if Phase 1 of the project was not achieved by July 31, 1995.

The Court issued an order on that day which, *inter alia*, (1) decreed that Allstate was temporarily restrained from withdrawing from the Fund an amount in excess of the amount provided for under section 3.05(d) of the Lease Agreement, which amount on the representation of counsel and agreed to by the plaintiff was calculated as $4,532,451.00; (2) directed that the parties appear before the Court on August 4, 1995 for further arguments on the various motions, including the intention of Allstate to withdraw all of the monies in the Fund; and (3) directed that the defendant Island Recycling submit a listing of the claims and their respective amounts represented by the defendants as being outstanding against the Fund.

### 2. The August 4, 1995 Hearing.

On August 4, 1995 Island Recycling submitted a listing of all the outstanding claims against the Fund, estimated to be $3.7 million. The plaintiff disputes this estimate. The plaintiff also submitted a supplemental memorandum of law, which reviewed a 1992 amendment by the New York State legislature to section 2.7 of the New York State Lien Law. According to the plaintiff, as a result of the amendment the Lien Law now defines improvements in property owned by industrial development agencies as "improvements of real property" and not "public improvements," for the purposes of granting a mechanic's lien against an owner's or contractor's trust assets under sections 70.1 and 70.5 of the Lien Law.

At the hearing on August 4, 1995, Allstate represented that it intended to withdraw all of the monies in the Fund, as a result of an alleged breach of the Lease Agreement by Island Recycling. On the other hand, Island Recycling disputed that there was such a breach, and contended that Allstate has no right to accelerate the redemption of its bonds.

After hearing the parties' contentions, the Court issued an order which stated in part that the remaining monies in the Fund may be subject to a valid lien under Article 3–A by Interel, but that the parties needed to address certain issues:

> While the Court is inclined to agree with the plaintiff that a reading of section 2.7 of the Lien Law indicates that the present project at the City of Glen Cove Co–Disposal/Energy Recovery Facility (the "Facility") is an "improvement to real property," and as such that Interel is not preclud-

ed from filing a mechanic's lien against any trust assets related to the Facility merely because the Facility's property is owned by the [Agency], the Court believes that the language of sections 70.1 and 70.5 of the Lien Law still requires that before such a lien can be filed, the funds or monies sought to be attached must *have been received* by the owner or contractor. The Court further believes that because the undisbursed funds delineated under section 3.05(d) of the Lease Agreement have been specifically carved out and designated to Allstate in the event phase 1 of the project is not completed, they are not funds which have been "received" by an owner or contractor for the purposes of creating a lien against them under sections 70.1 and 70.5 of the Lien Law.

With regard to the monies in the Fund remaining after Allstate withdraws the amounts under section 3.05(d) of the Lease Agreement, the Court believes that the plaintiff may have a valid lien against the monies, if the monies are deemed to have been "received" by Interel within the meaning of sections 70.1 or 70.5 of the Lien Law, either as an owner or contractor of the Facility. Allstate and the other defendants have not addressed this issue.

August 4, 1995 Order at 4–5.

In its order of August 4, 1995 the Court continued the temporary restraining order against Allstate, except that it allowed Allstate to withdraw 10% of the amount reserved under section 3.05(d) of the Lease Agreement. The parties were also directed to brief the following issues: (1) whether the Fund is a trust asset under section 70.1 of the Lien Law, and specifically whether the remaining monies in the Fund have been "received" by Island Recycling within the meaning of sections 70.1 and/or 70.5 of the Lien Law; (2) whether, assuming *arguendo* the monies in the Fund have been so received and Interel can file a lien against the Fund, Allstate retains a lien against the Fund which is prior to Interel's lien; and (3) the plaintiff Interel was to address whether this action can properly be maintained as a class action under Fed.R.Civ.P. 23, given that the plaintiff is representing approximately 25

subcontractors or materialpersons who allegedly can easily be joined as parties to this action. The parties were to return for a hearing today.

## DISCUSSION

*Criteria for a Preliminary Injunction.*

■ As explained above, the criteria for a preliminary injunction require the movant to establish (1) irreparable harm, and (2) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See Able v. U.S.*, 44 F.3d at 130; *Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

■ A showing of irreparable harm is perhaps considered the single most important requirement. *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990). Essential to a showing of irreparable harm is the unavailability or at least inadequacy of a money damages award. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies"). Also, the applicant must establish more than a mere "possibility" of irreparable harm. Rather, it must show that irreparable harm is "likely" to occur. *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990).

Moreover, the Court notes that a preliminary injunction is considered an "extraordinary remedy that should not be granted as a routine matter." *See, e.g., JSG Trading Corp.*, 917 F.2d at 80; *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir.1986); *Medical Soc'y v. Toia*, 560 F.2d 535, 538 (2d Cir.1977).

Finally, Fed.R.Civ.P. 52(a) requires that the district court sufficiently set forth its findings to permit appellate review. *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 902 F.2d 1085, 1088 (2d Cir.1990); *Weitzman v. Stein*, 897 F.2d 653 (2d Cir. 1990).

### 1. Likelihood of Success on the Merits.

In the Court's view the plaintiff is not likely to succeed on the merits, because the money it claims to be a trust asset under section 70.1 of the Lien Law does not meet the definition of a trust.

Section 70.1 of the Lien Law provides that funds received, or any right of action for funds to become due or earned, by (i) an owner for an "improvement of real property," or (ii) a contractor for a "public improvement," are held in trust to pay subcontractors and materialpersons. This includes a right to future payment on any unmatured or contingent claims of the subcontractors. The statute states in relevant part:

#### § 70. Definition of trusts.

1. The funds described in this section received by an owner for or in connection with an improvement of a real property in this state ... or received by a contractor under or in connection with a contract for an improvement of real property ... or a contract for a public improvement ..., and any right of action for any such funds due or earned or to become due or earned, shall constitute assets of a trust for the purposes provided in section seventy-one of this chapter.

For the purposes of this section: (a) any right to receive payment at a future time shall be deemed a right of action therefor and an asset of the trust even though it is contingent upon performance or upon some other event, but the fact the right is a trust asset does not enlarge the right to excuse any performance or condition upon which it depends.

The terms "public improvement" and "improvement for real property" are defined in section 2.7 of the Lien Law. Section 71 provides that the trust assets created pursuant to section 70 shall be applied to pay for the costs of the improvement, and to pay the claims of subcontractors and material persons.

New York law does not allow for a private lien to be filed against a "public improvement," which is defined by the statute as "an improvement of any real property belonging to the state or a public corporation." *See,*

*e.g., Sexauer & Lemke v. Burke & Sons Co.,* 228 N.Y. 341, 127 N.E. 329 (1920) (subcontractor cannot file lien against land owned by the City of New York). The rule has been extended to prevent the filing of a mechanic's lien against a leasehold interest where the underlying property is owned by a public entity. *See Avon Elec. Supplies, Inc. v. Voltaic Elec. Co., Inc.,* 203 A.D.2d 404, 610 N.Y.S.2d 852 (2d Dept.1994) (citing cases); *Ingram & Greene, Inc. v. Wynne,* 47 Misc.2d 200, 262 N.Y.S.2d 663 (Sup.Ct.Queens Co.1965) (creditor cannot place a lien on leasehold interest of land owned by City of New York used for the World's Fair); *Paerdegat Boat and Racquet Club, Inc. v. Zarrelli,* 57 N.Y.2d 966, 457 N.Y.S.2d 229, 443 N.E.2d 477 (1982) (where public property is leased to a private entity for a private purpose such as a health club, the leasehold interest is not subject to a mechanic's lien). *See generally,* Committee on Construction Law, *Mechanic's Liens on Public Property Leased to Private Entities,* 47 The Record of the Association of the Bar of the City of New York 89, 90–93 (1992).

Until 1992, the rule prohibiting private liens against real property owned by public entities was also applied to preclude liens against property owned by industrial development agencies. *See, e.g., Albany County Development Agency v. Gastinger Ries Walker Architects, Inc.,* 144 A.D.2d 891, 534 N.Y.S.2d 823, 825 (3d Dept.1988) (neither the real property owned by an industrial development agency nor the leasehold interest of the private entity leasing the property from the agency is subject to a private mechanic's lien); *Lincoln First Bank, N.A. v. Spaulding Bakeries Inc.,* 117 Misc.2d 892, 459 N.Y.S.2d 696, 701 (Sup.Ct.Broome Co.1983) (despite nominal and slight ownership interest in property by industrial development agency, subcontractor cannot place lien on property).

However, under a 1992 amendment to the Lien Law, improvements in property owned by an industrial development agency are not designated as "public improvements," but rather as "improvements of real property" under section 2.7 of the Lien Law. As such, a mechanic's lien can attach against an owner's or contractor's trust assets. *See* Lien

Law § 2.7 and § 70.1. The reason for the amendment was to close a gap in the Lien Law which prevented liens from being filed against property which was owned by an industrial development association based on the fiction that it was a public entity, but where possession or the beneficial interest in the improvement was vested in a private entity by means of leasing the property to the private entity. *See* Memorandum of Senator Hannon, 1992 N.Y.Legis.Ann.Ch. 662, at 415 (author of the revisions to the Lien Law).

Section 2.7 of the Lien Law currently states in relevant part:

> Public Improvement. The term "public improvement," when used in this chapter, means an improvement of any real property belonging to the state or a public corporation; however, if the beneficial interest of an improvement is in an entity other than the state or a public corporation notwithstanding legal title being vested in an industrial development agency ... then such improvement shall be considered an improvement of real property subject to mechanics' liens on real property as provided by section 3 of this chapter.

■ The plaintiff makes two arguments to support its contention that it can assert a lien because the trust asset—namely, the Fund—relates to an "improvement of real property." It first contends that the Agency owns and/or leases the Facility, and therefore under section 2.7 the construction at the Facility is an "improvement of real property" for purposes of the creation of a trust asset under section 70.1. Second, it alternatively contends that the language of section 2.7 which states "if the beneficial interest of an improvement is in an entity other than the state or public corporation *notwithstanding legal title being vested* in an industrial development agency" (emphasis supplied) must be construed as meaning that legal title of the improvement is vested with the industrial development agency, and not legal title *to the* property.

The Court disagrees with both of these contentions. With regard to the plaintiff's first contention, the real property of the Facility is not owned by the Agency, and neither does the Agency lease the Facility.

Rather, the City owns both the property and the Facility, and Island Recycling is under contract to operate it for the City. Contrary to the plaintiff's assertion, Island Recycling does not lease the Facility from the City. The Agency owns the Improvements that will be built at the Facility, and leases them to Island Recycling.

Accordingly, the real property is owned by a municipality, and the Improvements at the Facility are a "public improvement" as defined by section 2.7, and are not an "improvement to real property." The 1992 amendments to section 2.7 regarding the definition of an "improvement of real property" only allow private liens against real property owned by the industrial development agency. That is not the case here. As a result, the plaintiff cannot assert a lien against the Fund on the basis that the Fund is money "received by an owner for or in connection with an improvement of real property" under section 70.1.

With regard to the plaintiff's second contention, it is the Court's view that the plaintiff is misconstruing the statute. Read in context and in its entirety, the statute concerns title to real property and not to the improvement. Indeed, Senator Hannon's legislative statement describing the 1992 amendment to the definition of a "public improvement" is very clear that the amendment is aimed at allowing a lien in situations where title to the real property is given to the industrial development agency, but where the beneficial interest in the improvement was vested in a private entity by means of a lease to the private entity.

■ The plaintiff next contends that the Fund is a trust asset under sections 70.1 and 70.6, because it contains funds "received by a contractor under or in connection with ... a contract for a public improvement." The Court believes that this contention by the plaintiff is correct, because Island Recycling is a contractor as that term is defined in the Lien Law, and the proceeds of the bonds issued by Agency are to be used to finance a public improvement. *See Burns Elec. Co., Inc. v. Walton Street Assocs.*, 136 A.D.2d 291, 527 N.Y.S.2d 140, 142–43 (4th Dept.) (opera-

tor-vendee of property owned by an industrial development agency is also a contractor), aff'd, 73 N.Y.2d 738, 535 N.Y.S.2d 593, 532 N.E.2d 99 (1988).

However, it is well settled under New York state law that before funds for construction of realty become trust assets under Article 3–A, they must be paid—that is received—by the owner of the property or the contractor. Until such time, there is neither a *res* nor a trust. *See, e.g., Tri–City Elec. Co., Inc. v. People of New York*, 96 A.D.2d 146, 468 N.Y.S.2d 283, 287–88 (4th Dept. 1983) (funds held by State Comptroller designated for completion of highway and not paid to contractor were not subject to subcontractor's lien under Article 3–A as a trust asset); *Palmer Construction, Inc. v. Hines*, 154 Misc.2d 248, 584 N.Y.S.2d 271, 273 (Sup.Ct.Albany Co.1992) (monies withheld by State Commissioner of labor from project monies for purposes of paying wages to laborers not subject to lien under Article 3–A as a trust asset).

▇ The plaintiff argues that the monies in the Fund have been received by Island Recycling, and have merely been placed in trust with the Trustee. According to the plaintiff, the imposition of a Trust between the Fund and Island Recycling does not prevent Interel from filing a lien on the Fund. In support of its contention, the plaintiff cites two cases where it contends construction funds in trust accounts were deemed to be trust assets under section 70, and therefore subject to mechanic's liens.

In *People v. Rallo*, 46 A.D.2d 518, 363 N.Y.S.2d 851 (4th Dept.1975), aff'd, 39 N.Y.2d 217, 383 N.Y.S.2d 271, 347 N.E.2d 633 (1976), the construction loan was given to the builder at the closing, but placed in the builder's attorney's escrow account. The attorney diverted funds from the account, and the court held that the escrow account was a trust asset under section 70 for purposes of a allowing a mechanic's lien on the diverted funds. In *Northern Structures v. Union Bank*, 57 A.D.2d 360, 394 N.Y.S.2d 964 (4th Dept.1977), the construction loan was paid to the builder, and held in a bank account. The bank set off monies against the bank account holding the loan. The court held that the

bank account was a trust asset, and that the bank had improperly diverted funds when it set off against the account.

The Court believes that these cases are distinguishable, essentially because (1) the construction loans involved had actually been paid by the lender to the builder, and (2) the loans were kept in trust accounts owned or controlled by the builder. Here, although designated as being for the purpose of paying construction costs at the Facility, the Agency's bond proceeds were put in a trust account *for the benefit of the bondholder.* That the trust is in the bondholder's benefit is amply conveyed by the language in the second granting clause of the Indenture, and in the fact that the Fund is secured by a perfected lien on behalf of the Bondholder. Contrary to the situation in the cases cited by the plaintiff, here Island Recycling does not own or control the proceeds in Fund in the manner that a builder controls a construction loan already given to it.

In the Court's view, the bond proceeds have not been received by Island Recycling, and the plaintiff is not likely to succeed on the merits with regard to such a claim.

▇ In so holding, the Court recognizes that the language of section 70 provides that "any right of action for any such funds due or earned or to become due or earned," are also part of the trust asset. Indeed the statute states that "any right to receive payment at a future time shall be deemed a right of action therefor and an asset of the trust even though it is contingent upon performance or upon some other event." Arguably, Island Recycle's right to future payment from the bond proceeds in the Fund, though unmatured and contingent, is part of the trust asset created by section 70.1. *See Tri–County Plumbing & Heating Nassau, Inc. v. Brooklyn Women's Hospital Inc.*, 70 Misc.2d 65, 332 N.Y.S.2d 467, 470 (Sup.Ct.Kings Co.1972) ("[B]y operation of Article 3–A of the Lien Law all funds received, *owed or to be payable* in connection with improvements furnished, whether received from the owner or mortgagee, are deemed trust funds.") (emphasis added).

However, assuming *arguendo* that Island Recycling has such a contingent right to the proceeds in the Fund, according to the statute the fact that this right is a trust asset "does not enlarge the right or excuse any performance or condition upon which it depends." Thus, in the Court's view, once the July 31, 1995 deadline occurred, any right Island Recycling had to payment from the undisbursed amount held in reserve under section 3.05(d) of the Lease Agreement ceased. In addition, neither can any right Island Recycling may have to future payment from the remaining monies in the Fund be enlarged as against the perfected security interest Allstate holds against the Fund. Allstate's lien is prior in time to any lien Island Recycling would have, and is also prior to any statutory lien Interel has under the Lien Law.

Accordingly, in the Court's view there is no way Interel can file a lien on the Fund under the Lien Law.

■ Moreover, even if the plaintiff is given every benefit of the doubt and can be considered to have raised a serious question going to the merits that is a fair ground for litigation—namely, that the contingent claim of Island Recycling is enough to make the Fund a trust asset—in the Court's view on the facts alleged the balance of hardship here does not tip in favor of the plaintiff. The subcontractor is only delayed in payment for its services. The bondholder, on the other hand, would be prevented from redeeming its bonds.

**2. Irreparable Harm.**

■ Assuming that the plaintiff could meet the first prong of the test required in order to obtain a preliminary injunction, the Court agrees with the defendants that the plaintiff has failed to establish irreparable harm. The plaintiff's complaint and underlying action is essentially one to recover money damages for breach of contract and unjust enrichment against the contractor, Island Recycling, and the owner of the Facility, the City of Glen Cove. Interel's use of Article 3–A of the Lien Law in this proceeding is to gain access at funds alleged to be held in trust for it and other subcontractors to pay claims for work completed. However, the plaintiff's claims can also be satisfied from any money judgments gotten against the defendants on the contract actions, and are not limited to satisfaction from monies held by the Bank in the Fund.

Accordingly, the plaintiff's motion for a preliminary injunction is denied and the temporary restraining order against Allstate is vacated. The Court emphasizes, however, that this decision does not reach nor address the issues of (1) whether there has been a breach of the Indenture and Lease Agreement by Island Recycling, such that Allstate can accelerate redemption of the bonds, and (2) the jurisdictional objections against Interel's bringing this action, which the Court believes present serious problems to the plaintiff.

If any of the parties wishes to contest Allstate's intention to redeem its bonds, the governing agreements provide the procedures and remedies the parties must follow.

For the reasons stated above, it is hereby

**ORDERED,** that the plaintiff's motion pursuant to Fed.R.Civ.P. 65 for a preliminary injunction is denied; it is further

**ORDERED,** that the temporary restraining order issued against the defendant Allstate Insurance Company on August 4, 1995 is vacated; and it is further.

**ORDERED,** that the plaintiff is directed to respond to the defendant's motion to dismiss and address all of the defendants' jurisdictional objections—namely, (1) that the present action cannot be maintained as a class action under Fed.R.Civ.P. 23, (2) that once class action certification is denied and the other parties are joined as plaintiffs, complete diversity jurisdiction is destroyed, thereby precluding subject matter jurisdiction in this Court, (3) that although Interel has been "doing business" in New York, it has done so without the authority of the state, and therefore may not be entitled to maintain an action in this court, and (4) that, because of the pending Article 78 proceeding in the state court, the Court should abstain from hearing this case. The plaintiff is to file its response by Friday, September 29,

1995. The defendants are to reply, if they so choose, by Friday, October 13, 1995. Oral argument on the jurisdictional issues shall be heard on Friday, October 27, 1995.

**SO ORDERED.**