SEMAPHORE ENTERTAINMENT GROUP SPORTS CORPORATION; Sports and Entertainment, Inc., Plaintiffs,

v.

Hon. Pedro J. Rossello GONZALEZ, Governor of the Commonwealth of Puerto Rico, in his personal and official capacity; Hon. Eric R. Labrador Rosa, Secretary of the Department of Sports and Recreation, in his personal and official capacity; Hon. Manuel Diaz Saldaña, Secretary of the Department of the Treasury, in his personal and official capacity; and the Municipality of Bayamon, Defendants.

Civil No. 96–1175 (DRD).

United States District Court,
D. Puerto Rico.

Feb. 15, 1996.

Rafael Escalera–Rodriguez, Lasa, Escalera & Reichard, San Juan, PR and Enrique Velez–Rodriguez, Gonzalez Badillo & Lopez, San Juan, PR, for plaintiffs.

Bamily Lopez–Ortiz, Department of Justice, Federal Litigation Division, San Juan, PR, for defendants.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Following the denial of a request for a temporary restraining order, a show cause hearing on a preliminary injunction was scheduled and held on February 14 1996.

Plaintiffs seek from the Court an order enjoining Eric R. Labrador Rosa, in his official capacity as Secretary of the Department of Sports from enforcing its cease and desist order issued last Monday, February 12, 1996, that bars plaintiffs from complying with contractual commitments to hold in Bayamón Municipal Coliseum a sport event known as "The Ultimate Fighting Championship" that is to be televised in a programming of Pay Per View via Cable Television through the United States and various other countries this coming Friday, February 16, 1996.

### I. FACTS

Plaintiff Semaphore Entertainment Group Sports Corporation ("SEG"), a New York corporation, is the creator and promoter of the Ultimate Fighting Championship ("UFC"), a full-contact martial arts competition. Plaintiff Sports and Entertainment, Inc., ("SEI"), a Puerto Rico corporation, is engaged in the business of promoting various sports and entertainment events. Around June of 1995, SEG and SEI began negotiat-

ing for the presentation of the UFC event in Puerto Rico, and by December 4, 1995, SEI confirmed its agreement with the Municipality of Bayamón's Director of Sports and Recreation, Mr. Samuel Arreaga, to lease the municipality's Rubén Rodríguez Coliseum.

Based on the lease agreement, SEG entered into various contracts with suppliers of transmission equipment for the presentation of the UFC in Puerto Rico, with Pay–Per–View for the live broadcast of the event over cable television, and with other parties for the development of a promotional campaign for the cable TV broadcast and for the subsequent sale of videos of the event. Similarly, SEI has made various expenditures in relation to the promotion and advertisement in the local market of the event. The sale of tickets began shortly afterwards, and thousands of tickets have been subsequently sold. In addition, equipment necessary for the event has been shipped to Puerto Rico. While it is unquestioned that the Secretary of Sports has the power to regulate contact sports, Law 126 of 13 June 1980. P.R.Laws Ann., tit. 3, § 441 (1982 & Butterworth Supp. 1995), at the time that all of these contracts were entered, the Department of Sports and Recreation did not have in effect regulations regulating in any manner an activity similar to the UFC.

■ On February 2, 1996, the Department of Sports and Recreation issued an Order ("Resolución") for the investigation of the UFC through a public investigatory hearing to be held on February 6 and 8, 1996, for the purpose of investigating allegations that the UFC event is excessively violent.[1] Mr. José Axtmayer, an attorney in private practice, was appointed by the Department as an independent hearing examiner. The Department subpoenaed Mr. Richard Miranda, president of SEI, to appear at the hearing. Although the Department did not subpoena or other-

wise notify SEG, Mr. Miranda appeared with his and SEG's attorneys.

The Department's Order recites the sources of the Secretary's authority to regulate in the public interest sports and other entertainment activities. In particular, it declares that the Department has the authority to carry out studies and investigations into matters that affect sports and recreational activities, including the authority to request pertinent information and subpoena witnesses.[2] The notice also advised Mr. Miranda that he was entitled to have the assistance of counsel and to present documentary evidence.

At the outset of the hearing the examiner, Mr. Axtmayer, was asked by SEG's counsel whether the hearing was investigative or adjudicative. Mr. Axtmayer responded that:

> "Well, the character of this hearing is set out in the notice of public hearing. This investigator has the duty, in accordance with the law that creates this Department and its existing regulations, to make a full investigation of the spectacle and make some findings of fact ... and some recommendations ... Certainly I will not make any legal adjudication because I understand that even if I desired to do so, ..., I would be prohibited from doing so. The Department will take into consideration my recommendations ... and will act according to them, in accordance with the extant administrative law ... *I understand that this is not an adjudicative hearing and that at this moment it is an investigatory hearing.*" (Emphasis ours)

(Transcript of hearing, February 6, 1996, pp. 87–88)

Subsequently, the examiner rejected SEG's request for a continuance of the proceedings until Tuesday, February 13, in order to bring a referee and a doctor involved in previous UFC events. The examiner stat-

---

1. The Court takes judicial notice that there is pending in the Senate since February 1st, 1996 Bill 1332, which would prohibit "the presentation in the Commonwealth of Puerto Rico of competitions, spectacles, activities, championships, prize fight billboards, or wrestling programs, in the full contact category that affect the public interest and the general welfare of every

person in the country, whether a spectator or participant, and whether the event takes place in a public or in a private building." The bill is still pending.

2. The statutory source for this authority is to be found at P.R. Laws Ann., tit. 3, § 442(*o*) (1982).

ed that he did not need the testimony offered. Transcript, February 9, 1996, at 38.

■ At eleven in the morning on Monday, February 12, the examiner submitted his written report to the Department. Almost simultaneously, the Assistant Secretary of the Department of Sports and Recreation submitted an administrative complaint and request for immediate action. Two hours later, after "carefully evaluating the examiner's report, as well as the administrative complaint," the Department issued a cease-and desist order, effective immediately, whereby plaintiffs were barred from continuing the promotion and presentation of the UFC event.[3] The order also summoned the plaintiffs to an adjudicative hearing to be held on February 23, 1996, a full week after the event was originally scheduled to take place. Plaintiffs SEG and SEI now seek relief from that order.

## II. JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. 1331, 1343(a)(3) and (4) since Plaintiffs have alleged a civil rights federal law violation pursuant to 42 U.S.C. 1983 wherein government officials are sued in their individual capacities acting under color of law.

## III. STANDARD FOR GRANTING TEMPORARY RESTRAINING ORDERS AND PRELIMINARY INJUNCTIONS

As one noted commentator has explained, "a preliminary injunction is an injunction that is issued to protect plaintiffs from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." 11 Wright & Miller, Federal Practice and Procedure § 2948.

Equitable remedies, are to be granted discretionarily and only when the Court is satisfied that certain requirements are met. *Anheuser–Busch, Inc. v. Teamsters Local No. 633,* 511 F.2d 1097 (1st Cir.1975), cert. den. 423 U.S. 875, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975). The standard for obtaining a prelimi-

nary injunction in the First Circuit is clear, *Planned Parenthood League of Mass v. Bellotti,* 641 F.2d 1006, 1009 (1981).

■ At the outset we take note of the burden that appellants must meet in order to gain a preliminary injunction, the elements of which have recently been well summarized as follows:

> "In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction."

## IV. ANALYSIS

### A. Likelihood of Success

"No state shall ... pass any bill ... or law impairing the obligation of contracts." Article I § 10 U.S. Constitution

■ The procedural aspects of the due process of law limits governmental action which potentially may result in the deprivation of an individual's protected liberty or property interest. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) "Liberty" and "property" are terms protected under the Constitution. *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2706–07, 33 L.Ed.2d 548 (1972). Amongst the "core" liberty interests recognized and included are "not merely freedom from bodily restraint but also the right of individuals to contract, to engage in any common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children and to worship God according to the dictates of ... conscience." (Emphasis ours) (*Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042

---

**3.** Plaintiffs insinuate wrongful administrative conduct merely because the administrative decision was rendered a few hours after receipt of the record and the examiner's decision. The Court disagrees. There is nothing illegal in preparing a potential decision pending receipt of the examiner's report.

(1923) recently cited at *Board of Regents v. Roth*, 408 U.S. at 572, 92 S.Ct. at 2707. The right and liberty to contract are, thus, recognized as a liberty interest protected under the due process clause. *Board of Regents v. Roth*, 408 U.S. at 572, 92 S.Ct. at 2706–07.

■ As to the definition of "property interest":

"Property interests are not created by the Constitution of the United States; rather, they are created and their dimensions are defined by, existing rules or understandings that stem from an independent source such as state law … rules or understandings that secure certain [rights or] benefits and that support claims of entitlement to those [rights or] benefits." See *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

■ Property interest becomes protected for purposes of the due process clause when recognized by a state statute or legal contract. *Marrero García v. Irizarry*, 33 F.3d 117, 121 (1st Cir.1994) "an interest becomes a protected property interest when recognized by a state statute or legal contract, express or implied between the state agency and the individual." *Board of Regents v. Roth*, supra, at 577, 92 S.Ct. at 2709. Private contracts are subject to due process, *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 261–262, 107 S.Ct. 1740, 1747–48, 95 L.Ed.2d 239 (1987) "an employment contract between two private parties can create a property interest in the employer that is protected by due process." Professor Davis K. in his recognized work of *Administrative Law Treatise*, 1954 Vol. 2 p. 31 clearly recognizes the application of due process to private contracts as follows:

"When the government requires an individual to act in a manner inconsistent with his rights under a contract with another individual, however, the disadvantage party to the contract has no obvious remedy against either the other party to the contract or the government. In this situation, due process may be the only constraint on potential arbitrary government deprivation of a valuable contract right."

■ Before the private and public contracts entered into by SEG and SEI are affected by Administrative agencies the government must provide due process. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). The Court stresses that at the time the contracts were entered into no law, or regulation made such contracts illegal. In *Cotnoir v. University of Maine Systems*, 35 F.3d 6, 10–11 (1st Cir.1994) the First Circuit set forth the due process criteria that the state must comply when there is "a potential loss of a protected interest". A predetermination hearing must be held where "Notice of the proposed action" and "opportunity to respond" is provided to the affected party.

■ In the instant case the Court concludes that plaintiff SEI was provided adequate notice of the proposed "investigative" hearing; coplaintiff "SEG" was also provided adequate constructive notice through "SEI" its agent in Puerto Rico to handle all local affairs, including, contracts, publicity, and relations with the government. SEG, in fact, appeared at the hearing through counsel Rafael Escalera Rodríguez. However, the requirement of *Loudermill* of "notice of the proposed action" was never provided by the Secretary of Sports, thus, the affected party's "opportunity to respond" was emasculated. The subpoena for a hearing to the affected parties states the following:

"The purpose is to investigate the spectacle denominated "Ultimate Fighting Championship" to be held on 16 February 1996, because it is alleged that the same is excessively violent." (Translation ours)

Further, at the hearing the Examining Officer clearly stated to counsel for the affected parties that the hearing was investigative and not adjudicative.

"I understand that this is not an adjudicative hearing and that at this moment it is an investigative hearing." Tr. P. 87–88.

■ Administrative procedure "investigative hearings" are potentially rule making in nature and thus prospective. See APA § 551(5). "Adjudicative hearing" is the process of formulating an order as "part of a

final disposition whether affirmative, negative, injunctive or declaratory in form ... other than rule making ..." See also APA § 551(7). Thus, an "investigative hearing" could not adjudicate the rights of plaintiffs' contracts.

Defendants have alleged that by citing the general purposes of the Organic Law, plaintiffs should have known that the contracts were in jeopardy. The Court disagrees. Due process requires the affected party to have knowledge of the proposed action which is not provided by citing the general purposes of the law simply because the affected party cannot "adequately respond" to the general purposes of the law. Moreover, a statement from the Examining Officer that the hearing is "investigative" in nature (rule making) does not lead a reasonable person to conclude that plaintiffs' contracts were to be "adjudicated."

The Court, therefore, notes probable likelihood of success favoring plaintiffs because the public and private contracts entered into by plaintiffs that have been affected by state action are subject to federal due process requiring "notice of proposed actions" such notice was not provided by the Secretary of the Department of Sports and Recreation. *Cleveland Board of Education v. Loudermill,* supra; *Cotnoir v. University of Maine,* supra.[4]

### B. Irreparable Injury to Plaintiffs

In the instant case Plaintiffs have provided undisputed evidence that the existence of their business is threatened and that their business goodwill, credibility and repu-

tation are in jeopardy should they not be able to comply with their contractual obligations.

Ordinarily, economic harm is not sufficient to satisfy this prong of the test for injunctive relief. That is because economic harm is not irreparable insofar as it is compensable by the granting of money damages, harkening back to the general requirement that in order to qualify for equitable relief, such as an injunction, a party must demonstrate that it lacks an adequate remedy at law. However, even economic harm may be irreparable when it looms so large as to create a credible threat to the existence of the moving party's business. *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2nd Cir.1970).[5]

Further, there is compliance with the irreparable harm criteria when the harm is not easily quantifiable, such as when the action that is sought to be enjoined would besmirch plaintiffs' business credibility, reputation, and good will. *Planned Parenthood v. Citizens for Com. Action,* 558 F.2d 861, 867 (8th Cir.1977); *Cutler–Hammer, Inc. v. Universal Relay Corp.,* 285 F.Supp. 636, 639 (D.N.Y.1968).

### C.

**Injury to plaintiffs will outweigh any harm which granting the injunctive relief will inflict upon defendants. Public interest adversely affected by the granting of the injunction.**

The Court discusses these injunctive standards concurrently because the defen-

---

4. Plaintiff has also urged the Court to grant the Preliminary Injunction on Defendants' failure to comply with its own, administrative laws and regulations requiring the holding of an "adjudicative hearing". The Court declines. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) prohibits a federal trial court from "ordering state officials to conform their conduct to state law". *Cuesnongle v. Ramos,* 835 F.2d 1486, 1496 (1st Cir.1987). Plaintiffs further have requested that injunctive relief be granted under freedom of association principles as set forth in the First Amendment. However, the participation of martial artists in this type of competition, like the association of dancers or businessmen qualifies as neither "a form of 'intimate association'

nor as a form of 'expressive association' as those terms were described in Roberts." *Dallas v. Stanglin,* 490 U.S. 19, 24–26, 109 S.Ct. 1591, 1594–96, 104 L.Ed.2d 18 (1989) (citing *Roberts v. U.S. Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Therefore, any state regulation or law affecting the UFC is reviewable under a rational basis test.

5. "When the potential economic loss is so great as to threaten the existence of the moving party's business, then an injunction may be granted, even though the amount of direct financial harm is readily ascertainable" 11 Wright & Miller Federal Practice and Procedure, § 2948, 440 (1973).

dants in the instant case represent the public interest.

Defendants urge the Court to stay its hand and deny the injunctive relief notwithstanding a high probability of success and the presence of irreparable damages based on a potential adverse public interest. Defendants refer to the Court the case of *Weinberger v. Romero–Barceló,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), where the court stated the following:

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Railroad Commission v. Pullman Company,* 312 U.S. 496, 500 [61 S.Ct. 643, 645, 85 L.Ed. 971] [cits. omitted] (1941). Thus, the Court has noted that "[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," and that "where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the Court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff. *Yakus v. United States, supra,* 321 U.S. [414] at 440, 64 S.Ct. [660] at 675 [88 L.Ed. 834 (1994) ] (footnote omitted). The grant of jurisdiction to enᵽure compliance with a statute hardly suₐgests an absolute duty to do so under any and all circumstances, and the federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law. *TVA v. Hill,* 437 U.S. [153] at 193, 98 S.Ct. [2279] at 2301 [57 L.Ed.2d 117 (1978) ]; *Hecht v. Bowles,* 321 U.S. [321], at 329, 64 S.Ct. [587], at 591 [88 L.Ed. 754 (1944) ].

However, the case of *Weinberger,* supra, is a national defense case wherein the public policy is clearly defined and further the injunctive relief sought was not the only means of insuring compliance with the laws by the enjoined defendant, the United States Army.

In the instant case, however, there is at this writing no public policy prohibiting and even regulating martial arts combats ·as that presented by "UFC". There are no regulations established by the Administrator as to martial art type of spectacles. For the Administrator to intervene in a martial arts event he would have to act without any administrative standards whatsoever leading to potential "unfettered" discretion which the courts have not hesitated to overrule. *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) The Court further notes that there are a number of other martial arts fighting activities that have not been regulated and are not being regulated. The Court, therefore, can not stay its hand in favor of a public policy that has not been explicitly or implicitly established either by regulation or pursuant to law.

In balancing the interest of the parties the equity favors Plaintiffs who have suffered a substantial procedural due process violation to their contractual rights over a potential and unidentified harm to a public policy that is nonexistent.

## V. CONCLUSION

Defendant Eric R. Labrador Rosa[6] is enjoined from enforcing its cease and desist order of February 12, 1996 because said order violates Plaintiffs' procedural due process rights under the Fourteenth Amendment. The federally protected liberty and property rights of Plaintiffs SEC and SEI are being seriously infringed by the cease and desist order issued by codefendant Eric R. Labrador Rosa. The UFC martial arts spectacle is authorized to proceed enabling Plaintiffs to comply with their contractual obligations. Art. I § 10 U.S. Constitution; *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

IT IS SO ORDERED.

---

**6.** No evidence was presented at the hearing as to     the other defendants.